# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Randy A. Eastvold,

        Plaintiff,

vs.                            REPORT AND RECOMMENDATION

Michael J. Astrue,
Commissioner of the Social
Security Administration,

        Defendant.        Civ. No. 03-3054 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 405(g) of the Social Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's final decision which denied his application for Disability Insurance Benefits ("DIB").  The matter is now before the Court upon the parties' cross-Motions for Summary Judgment.  The Plaintiff has appeared by Lionel H. Peabody, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.  For reasons which follow, we recommend that the Plaintiff's Motion be denied, and that the Defendant's Motion be granted.

## II. Procedural History

The Plaintiff applied for Disability Income Benefits (DIB) on November 1, 2000, alleging physical impairments of degenerative arthritis in his right knee, low back, hip, and right elbow, and mental impairments of post-traumatic stress disorder ("PTSD"), major depression, and alcoholism. He alleged an onset date of March 15, 1997, which he later amended to September 1, 1998. [T.223]. A Hearing was held on July 23, 2002, [T. 137-160], which resulted in a denial of his application for DIB. [T.126-36].

The Plaintiff filed a Complaint seeking judicial review of the Commissioner's final decision on May 2, 2003. See, Docket No. 1. However, pursuant to a stipulation by the parties, the District Court remanded the action to the Commissioner for further consideration, pursuant to Sentence Six of Title 42 U.S.C. §405(g), with directions to "further evaluate Plaintiff's physical and mental impairments," to "consider all of the evidence of record, particularly the evidence from the Department of Veteran's Administration," and to "sufficiently explain the reasoning behind his decision with specific references to the record in support of his decision." Order, Docket No. 4.

A second Hearing was held on September 15, 2005, and the ALJ issued a decision, on February 2, 2006, that denied the Plaintiff's application for a second time.

[T. 1973]. However, on August 11, 2006, the Appeals Council vacated the decision, and ordered a remand, based upon its finding that the ALJ had not properly explained the reasoning behind his decision, pursuant to the Court Order. [T. 2000]. A third Hearing was held on October 17, 2006, and the ALJ issued her decision which denied the application on March 8, 2007. [T. 22].

In her decision, the ALJ determined that the Plaintiff suffered from the claimed disabling mental and physical impairments, but that chemical dependency was a material contributing factor, thereby barring an award of DIB. [T. 40-41]. On December 19, 2008, the Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner. [T. 14]. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, supra at 943-44; Title 20 C.F.R. §404.981.

Upon the completion of the administrative process following the Sentence Six remand, the District Court directed the Plaintiff to file his Motion for Summary Judgment. See, Docket No. 14. The Plaintiff has done so, see, Docket No. 20, and we now proceed to a judicial review of the Commissioner's decision.

III. Administrative Record

A.   Factual Background.  The Plaintiff was 50 years of age, and older, at all times relevant to his DIB application.  The Plaintiff is a veteran of the Vietnam War, and he participated in eleven (11) military operations in Vietnam, from April to June of 1968.  [T.1809, 1620, 1618].  In November of 1974, the Plaintiff was seriously injured in a motor vehicle accident.  [T. 1055-1062, 1523].  Since that time, the Plaintiff has worked as a millwright, [T. 2091], briefly, as a ranch hand, [T. 1251], and as a tractor-trailer driver.  [T. 2064].  The Plaintiff earned no income in 1993, 1994, and from 1998 forward.  [T. 2084].  The Plaintiff alleges that he has been unable to work full-time, since September 1, 1998, due to in his right knee, low back, hip, right elbow, as well as his mental impairments of PTSD, major depression, and alcoholism.  The Plaintiff's insured status expired on December 31, 1999. [T. 26]

1.   Medical Records Before Alleged Onset Date of September 1, 1998.

On September 11, 1974, the Plaintiff was in an automobile accident, in which he suffered an open fracture of his left elbow, an open fracture of his right knee, and multiple chest injuries, [T. 1059], that required surgery to remove his spleen, his right patella, and a bony fragment from his left elbow.[1]  [T. 1061-62,

_____

[1]The Record in this case is extraordinarily voluminous.  We have carefully
(continued...)

1523]. An x-ray of his knee, that was taken at the St. Cloud Hospital prior to that surgery, revealed a fracture, extensive soft tissue injury, and foreign material in the soft tissue of the knee. [T. 1073].[2] On April 11, 1983, the Plaintiff underwent arthroscopy on his right knee, which revealed marked degeneration, severe arthritis, loss of cartilage, and large calcifications that were imbedded in a posterior capsule. [T. 1929].

---

[1](...continued)
reviewed each document but, in the interests of space and clarity, we have only summarized the medical and other records that are relevant to the Plaintiff's claim of disability. In particular, the Record contains a number of records that relate to the Plaintiff's military service, from 1966 to 1968, which he previously submitted in a application, in 1969, for Veteran's Disability Benefits, and which do not relate to his claim of disability here. [T. 1075-96, 1607-59, 1632, 1660-64].

The Record also contains a large volume of medical records from May of 2006, and thereafter later. [T. 2103-2661]. We have reviewed those records carefully, but we only summarize a few of them in this Opinion, as they document the Plaintiff's condition several years beyond his date last insured, and after significant changes, including a spiral fracture of his right femur, [T. 605], and the development of liver disease. [T. 2533]. See, e.g., Bracey v. Astrue, 2009 WL 86572 at *3 (E.D. N.C. January 6, 2009); Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995)(records indicating that the plaintiff was recovering well were outdated, where medical records from one (1) year later indicated deterioration); Williams v. Barnhart, 2002 WL 31185864 at *5 (D. Minn., September 30, 2002)(ALJ erred in not obtaining more recent medical records, where the record showed "major changes in [the plaintiff's] circumstances" near to the relevant time period).

[2]The St. Cloud Hospital Records are duplicated at pages 1520 to 1539.

The Plaintiff met with a counselor at the Vet Center Program on November 21, 1986, November 29, 1986, and December 4, 1986, to discuss his mental health, [T. 1950-52], and the counselor noted that the Plaintiff reported symptoms which "indicated probability of PTSD." [T. 1952]. The Plaintiff was again seen by a counselor at the Vet Center, in Missoula, Montana, on January 4, 1988, and February 22, 1988, to discuss PTSD. [T. 1947, 1949].

Dr. Patrick R. Robins treated the Plaintiff for a number of years, beginning in 1986, for his right knee problems. [T. 364-70]. Dr. Robins' treatment notes reveal that he observed "significant degenerative arthritis of both knee joint compartments with multiple loose bodies present," and "early advance degenerative changes" in the knee joint. [T. 370, 1291]. Dr. Robins performed arthroscopic debridement on the Plaintiff's right knee on December 23, 1986, [T. 369, 1291], after the Plaintiff had suffered a fall, [T. 928], and he documented the Plaintiff's reduced range of motion on January 27, 1987, with improvement on February 17, 1987, and he opined that the plaintiff should seek more sedentary work than his work at the mill, [T. 366, 367, 368, 1290], but recommended no further therapy. [T. 368]. The Plaintiff received some physical therapy, [T. 919-20], and reportedly negotiated a new position with his job, in order to "allow him more protection of the right knee (less climbing of ladders, less

standing and kneeling)." [T. 919]. On March 30, 1987, Dr. Robins observed loose bodies in the right knee, but the knee swelling had improved by April 6, 1987. [T. 1292].

On April 6, 1987, Dr. Robins concluded that the Plaintiff should be restricted to a "sedentary type of work," [T. 1292], and noted, on January 26, 1988, that he had informed an official with the Department of Labor that the Plaintiff should avoid jobs "involving squatting, kneeling, frequent standing, carrying of heavy loads, etc." [T. 366]. Several months later, on April 11, 1988, Dr. Robins observed no effusion and full extension and flexion in the right knee -- an improvement over his examination in January of 1987 -- with no significant crepitation, which was a significant improvement, but x-rays revealed a narrowing of the knee joint consistent with degenerative arthritis. [T. 365, 1295]. On May 23, 1988, after receiving the results of a vocational examination, Dr. Robins concluded that, with restrictions on kneeling, climbing, and squatting, the Plaintiff could return to work, and that "regular walking, sitting, or the usual activities of daily living would hopefully not be a deterrent to his working," and that, if the Plaintiff's "job description f[ell] into this catagory [sic] of regular use of his right knee I cannot see any contraindication for him to go back [to work] at this time." Id.

The Plaintiff was hospitalized from August 29, 1987, to September 1, 1987, with complaints of weakness, blurred vision, and nausea, and he developed a low sinus bradycardia, but two EKGs were interpreted as normal, and he was advised to reduce his alcohol and tobacco use. [T. 901-05]. Dr. W.H. Peschel examined the Plaintiff, and reported that his knee was slightly deformed, and had a recent scar from arthroscopy. [T. 905]. An x-ray from September 1, 1987, revealed a small hiatal hernia, and degenerative changes in the upper thoracic spine. [T. 908].

On June 10, 1988, the Plaintiff was transported by ambulance, [T. 949], to St. Patrick Hospital in Missoula, Montana, for severe burns from a propane explosion. [T. 945-51]. The Plaintiff was then transferred to the Harborview Medical Clinic, at the University of Washington Hospital, [T. 955-81], where he experienced alcohol withdrawal, [T. 1315], and received skin grafts on his arms, hands, right flank, and right foot. [T. 950, 955-57, 969].[3] The Plaintiff reported to a social worker that he had previously been let go from his employment because of his knee problems. [T. 981]. He was noncompliant with splints to protect his skin grafts. [T. 983]. The medical staff observed that he was confused and disoriented on June 13, 14, 15, 17,

_____

[3]The Harborview medical records are duplicated on pages 1301 to 1523, with additional records; where the additional records add substantive information, we have included them in this summary.

22, 24, 25, and 28. [T. 978, 983, 985, 998, 1001, 1009, 1013, 1015, 1343, 1345, 1437]. It was determined that this was the result of alcohol withdrawal, and he was treated with librium,[4] which resulted in improvement. [T. 951, 986, 1424-27]. He was more oriented and less confused on June 27, and 30, 1988. [T. 987, 1331]. He was discharged on July 2, 1988. [T. 990].

The Plaintiff received inpatient substance abuse treatment, from December 5, 1988, to December 23, 1988, [T. 932-44, 1221-34], "by way of an intervention by his employer." [T. 933]. In the discharge summary of his counselor, Don P. Kurtz ("Kurtz"), Kurtz noted that the Plaintiff's attitude and appearance improved when he broke through his denial regarding his substance abuse. [T. 933]. The physician noted no abnormalities [T. 936], and the treatment coordinator noted that the Plaintiff appeared to have "some delayed stress syndrome issues to deal with [from the Vietnam War]," [T. 936], but declined to make a formal diagnosis. [T. 937]. The treatment coordinator also noted that the Plaintiff had "some difficulty in the detox

---

[4]Librium "is indicated for the management of anxiety disorders or for the short term relief of symptoms of anxiety, withdrawal symptoms of acute alcoholism, and preoperative apprehension and anxiety." Physician's Desk Reference, at p. 3299 (62nd Ed.).

period," but "claim[ed] no current or past history of psychiatric or psychological abnormalities." [T. 937]. The Plaintiff reported arthritis and knee pain. [T. 936].

The Plaintiff attended the Substance Abuse Treatment Service ("SATS") program beginning on June 6, 1989, [T. 1872], and from which he was discharged to out-patient status on June 27, 1989. [T. 1871, 1872-90]. He reported severe depressive symptoms in a consultation report with Dr. Peregrino A. Natividad on June 8, 1989, [T. 1885], reported adverse memories of the Vietnam War, one (1) to two (2) times daily, to Peter B. Gregory, M.A. on June 7, 1989, [T. 1887], and reported a twenty (20) year history of alcohol use. [T. 1889]. In a Discharge Report dated June 27, 1989, Dr. Natividad reported that the Plaintiff had been given a psychiatric consultation due to "his history of suicidal ideation," and had been prescribed Desipramine,[5] and Imipramine,[6] and later Tagamet.[7] [T. 1873]. Dr. Natividad

─────────────────────

[5]Desipramine hydrochloride is a "tricyclic antidepressant * * * also used in the treatment of anxiety, chronic pain," and other ailments. Dorland's Illustrated Medical Dictionary, at 507 (31st Ed. 2007).

[6]Imipramine is a "tricyclic antidepressant." Dorland's Illustrated Medical Dictionary, at 929 (31st Ed. 2007).

[7]Tagamet is the trademark for a preparation of cimetidine, which "inhibits gastric acid secretion." Dorland's Illustrated Medical Dictionary, at 368 and 1892 (31st Ed. 2007).

reported that, "[w]ith all this medication, he seems to have improved considerably and during all this time, he didn't have any problem with the program, [or] attending all the required activities," that the Plaintiff could partake in activity as tolerated, and that his general condition at discharge was "satisfactory." [T. 1873]. The counselor[8] at SATS noted that the Plaintiff reported "that his depression and suicidal ideation had disappeared," during his treatment at SATS, but that hospital staff had confronted the Plaintiff, at one point, regarding his negative attitude toward the facility, and that his post-treatment sobriety plan was insufficient. [T. 1876, 1879, 1880].

Following discharge, the Plaintiff returned for several follow-up mental health appointments with Delma Sommers, who is a Certified Social Worker. In his near-monthly appointments, from July 12, 1989, to January 5, 1990, the Plaintiff reported that the anti-depressant medication was helping him sleep and eat better, [T. 1871], that he still felt emotional but "not real depressed," [T. 1870], but that he did have trouble sleeping when he took his medication at the wrong time. [T. 1869]. On October 4, 1989, the social worker observed that the Plaintiff smelled of alcohol and admitted to drinking, and had not taken his medication in the previous week. [T.

---

[8]The counselor's signature on the records is illegible.

1869].[9]  However, on November 1, 1989, the Plaintiff reported that he had not had a drink since his last appointment, and expressed anger and frustration about his life. [T. 1868].  On January 5, 1990, the Plaintiff reported that he had stopped taking his medication, and was feeling depressed, and having difficulty controlling his emotions. [T. 1867].  The social worker renewed his medications, and urged the Plaintiff to attend Alcoholics Anonymous for continuing support.  [T. 1867].

On October 22, 1990, the Plaintiff saw Dr. Robins for the first time in nearly two and one-half (2½) years.  [T. 364].  Dr. Robins observed the right knee had a full range of motion, with good stability, and no significant joint-line crepitus, but that x-rays revealed bone spurs, and degenerative changes, in the left elbow.  [T. 364].  Dr. Robins concluded that the Plaintiff should avoid major surgeries on his right knee, so as to be able to put off a knee replacement as long as possible.  [T. 364].

On November 1, 1990, the Plaintiff was referred to Dr. Stephen G. Powell for his left elbow.  [T. 889, 1299].  Dr. Powell observed tenderness and slight crepitation in the elbow, and a full range of motion, except for about five (5) degrees of extension.  [T. 888, 1299].  X-rays revealed a large loose ossicle of the olecranon,

---

[9]The social worker had previously advised the Plaintiff that his medications would mix poorly with alcohol.  [T. 1870].

which Dr. Powell removed on January 14, 1991, [T. 897], and degenerative changes were also noted.  [T. 888].  After the surgery, Dr. Powell felt that the Plaintiff could return to work on February 18, 1991.  [T. 889].

The Plaintiff was treated at St. Patrick's Hospital, in Missoula, Montana, for acute alcohol intoxication, from August 13, 1991, to August 30, 1991, and on November 6, 1991.  [T. 1916, 1911].  On August 16, 1991, the Plaintiff underwent a Biopsychosocial Assessment by Dennis Maercklein ("Maercklein"), who is a Treatment Coordinator with the Addiction Treatment Program.  [T. 1917-23].  Maerchklein reported that the Plaintiff may "have some post traumatic stress disorder," [T. 1918], but he observed no cognitive problems.  [T. 1920].  On October 18, 1991, a progress note from the Vet Center in Missoula, Montana, reflects that the Plaintiff went in to discuss returning to mental health counseling.  [T. 1940]. On or about October 23, 1992, the Plaintiff completed the Mississippi Scale for Combat-Related PTSD, with a score of 114, which is above the cut-off score of 107.[10]  [T. 1934].

---

[10]It appears that the Plaintiff completed the Mississippi Scale a second time, and received a score of 119, but both forms are undated and unsigned.  [T. 1941-1944].

On May 15, 1992, Dr. Powell examined the Plaintiff's left elbow, and observed that the elbow had a full range of motion, with "slight subluxation of the ulnar nerve," and no tenderness over the common extensor origin, but with hypersensitivity at the ulnar nerve and resulting weakness. [T. 888, 1300]. Dr. Powell also briefly examined the right knee, and noted tenderness along the medial joint line, and also noted that the Plaintiff walked with a slight limp. [T. 888]. Dr. Powell observed that the Plaintiff "was a bit inebriated in the office," and documented that he advised the plaintiff that "alcohol can cause problems with neuropathy which certainly is a diagnostic point in evaluating his ulnar nerve." [T. 888]. Dr. Powell diagnosed ulnar neuropathy in the right elbow, and traumatic arthritis of the right knee, with "current flare-up of his inflammation," and he provided the Plaintiff a note for work for the rest of the week, because of the knee soreness. [T. 888]. The Plaintiff did not appear for his next appointment. [T. 888].

On August 13, 1994, the Plaintiff was treated by Dr. David Ryan-Gorman for a loss of consciousness resulting from acute alcohol intoxication, which was his third treatment for acute intoxication in the previous fourteen (14) months. [T. 1270]. On discharge, Dr. Ryan-Gorman made a final diagnosis of profound depression with some PTSD, and alcoholism, [T. 375], and he encouraged the Plaintiff to seek "outside help

for his chronic and profound problems," but the Plaintiff refused "any kind of medicine for depression or therapy," and so, Dr. Ryan-Gorman made no referrals. [T. 374, 1275]. In a later note, Dr. Ryan-Gorman again recorded his diagnosis of August of 1994, which identified the Plaintiff as having a depressive disorder, acute alcoholic intoxication, alcoholism, episodic, alcohol amnestic syndrome, and prolonged posttraumatic stress disorder, and noted that the Plaintiff had been treated with alcohol rehabilitation and detoxification. [T. 1287].

The Plaintiff saw a physician, apparently Dr. Ryan-Gorman, on August 15, 1994, with complaints of ear pain, depression, coping difficulties, and insomnia, and he requested an exam for disability benefits. [T. 381]. Dr. Ryan-Gorman examined the Plaintiff's painful ear, and diagnosed severe depression, alcoholism in response to grief reaction, otitis media, and externa of the right ear, and "significant disabilities due to bullet wounds in the right knee and apparently left elbow." [T. 381]. Dr. Ryan-Gorman treated the Plaintiff again, on September 9, 1994, for an acute rib contusion, from an assault, and he also diagnosed chronic alcoholism. [T. 372]. Dr. Ryan-Gorman treated the Plaintiff nearly one (1) year later, on July 26, 1995, for edema in his extremities, and Dr. Gorman noted that the Plaintiff's extremities were hot. [T. 371].

On December 28, 1994, Judith Bowman, Ph.D., and Dr. Virginia Hill, completed a Court-ordered psychological and psychiatric assessment of the Plaintiff, while he was residing at the Forensic Treatment Facility, at the Montana State Hospital. [T. 389-396, 1262-69]. Drs. Bowman and Hill found that the Plaintiff's "history is most significant for years of serious alcoholism," and that he "began drinking at age 16," but that his family members "noted a serious progression of his drinking habits upon return from Vietnam at age 20-22." [T. 390, 1263]. They also noted that, in a VAMC assessment from 1989, the Plaintiff had denied symptoms of PTSD. [T. 390, 1263]. The Plaintiff completed an MMPI-II exam, which revealed anger and resentment, which indicated "attitudes of hostility and over-sensitivity, as opposed to symptoms of mental disorders." [T. 1264]. The doctors also advised that the MMPI-2 results reflected his depression was secondary to his alcoholism, and that the depressive symptoms appeared to be exacerbated by the legal charges, concluding that they may be "situational and may decrease when stressor decrease." [T. 391, 1264]. The Plaintiff completed an MCMI-II exam, which revealed antisocial indicators which the doctors felt might correlate with paranoid tendencies, which manifested in rigid opinions and role expectations, and anger at authority figures, and which might be experienced as depression. [T. 1265].

Drs. Bowman and Hill noted that the Plaintiff was oriented to person, time, and place, that his speech was rapid and somewhat pressured, that his mood was mildly depressed and angry, that his thought processes were logical, linear, concise, and coherent, that his concentration was normal, and his memory was within normal functioning limits for persons having experienced significant head trauma, in the 1974 car crash, and that he appeared to be functioning within the average range of intelligence, but that his abstraction ability was mildly impaired. [T. 393-94, 1266-67]. The Plaintiff also admitted to passive suicidal ideation, and the doctors noted nonexistent insight and motivation, and concluded that his prognosis was poor, and that he did not recognize the seriousness of his alcoholism. [T. 394, 1267].

The report reflected that the Plaintiff had been cooperative, social, and non-suicidal, during his six week stay at the hospital, but that the staff had noted "quick temper outbursts, at times," but "no nightmares or easy startle responses," and that he had been prescribed Ambien[11] for sleep, and that his routine admission physical examination had been normal, except for liver damage consistent with long-term alcohol abuse. [T. 395, 1268]. The report further noted that a counselor at the

_____

[11]Ambien is a trademark for zolpidem tartrate, which is used for the short-term treatment of insomnia. Dorland's Illustrated Medical Dictionary, at 58 and 2120 (31st Ed. 2007).

Forensic Treatment Facility had concluded that the Plaintiff's depression was "a part of an unarrested alcohol dependence," and related that the Plaintiff did not meet the criteria for PTSD at that time. [T. 395-96, 1268-69].

The Plaintiff underwent a mental health intake screening, at the Montana State Prison, on August 15, 1995, where he reported his degenerative joint disease, and a 1994 evaluation for PTSD, but no previous or current psychiatric medications. [T. 1855]. The Plaintiff reported that he had been through substance abuse treatment three (3) times, but drank alcohol daily, and the examiner noted that the Plaintiff was oriented, with normal language, and a cheerful, cooperative mood, but was unable to remember names. [T. 1856]. The examiner noted no problematic thought content, and diagnosed no mental disorders. [T. 1856-57]. The examiner recommended chemical dependency treatment, an anger management group, a stress management group, and the "moral recognition therapy group," but no medication evaluations. [T. 1859].

On August 16, 1995, the Plaintiff also underwent a physical intake exam at the Montana State Prison, where the examiner noted the deformity of the right knee, but cleared him for all work assignments. [T. 1850-51]. In his preliminary health evaluation on August 9, 1995, the Plaintiff reported that he was in "pretty good"

physical condition, and "good" mental condition, but he could not climb ladders due to his knee, and reported taking medication for his arthritic pain.  [T. 1860].

On August 29, 1995, the Plaintiff saw Daniel Troupe ("Troupe"), who is a Certified Physician Assistant, with complaints of increased knee pain "because of lack of exercise," and Troupe observed a full range of motion, and gait within normal limits, but a large effusion and extensive osteoarthritic spurring.  Troupe prescribed Feldene,[12] and noted a history of degenerative joint disease,  and expressed the view that the Plaintiff's "best bet [was] to put off having a total knee replacement as long as possible but eventually it will need to be done."  [T. 1848-49].

On October 24, 1995, the Plaintiff saw Dr. J.R. Sims, Jr., with complaints of knee pain, and he reported that he had previously taken Feldene, but had not been able to exercise at that time, so he did not know how effective it was.  [T. 1847].  Dr. Sims observed possible crepitation with flexion and extension, and that the Plaintiff walked "fairly well" on his right leg.  [T.1847].  Dr. Sims diagnosed severe osteoarthiritis, and he prescribed Feldene and Ben Gay.  [T. 1847].  On December 19, 1995, the Plaintiff saw a Don Sullivan ("Sullivan") with a request that his work boots, from home, be

---

[12]Feldene is a trademark for piroxicam, which is an anti-inflammatory indicated for the treatment of rheumatoid and osteoarthritis.  Dorland's Illustrated Medical Dictionary, at 695 (31st Ed. 2007).

sent to him, for his new job on a construction crew at the facility. [T. 1846]. At that time, the Plaintiff reported that Feldene gave him "good control of his arthritis." [T. 1846].

On March 20, 1996, the Plaintiff saw Sullivan with complaints of knee pain, purportedly as a result of his new prescription for Lodine[13] being less effective than Feldene. [T. 1844]. Sullivan added a prescription for Tylenol, as Feldene was no longer available through the Prison plan. [T. 1844]. On October 1, 1996, the Plaintiff was again seen by Sullivan with complaints of right knee pain, and the ineffectiveness of Lodine as a treatment. [T. 1842]. Sullivan noted the Plaintiff's history of degenerative disc disease, discontinued the Lodine, and prescribed Naprosyn.[14] [T. 1842]. On October 10, 16, and 23, 1996, the Plaintiff was seen by Sullivan for treatment and follow-up for a sebaceous cyst. [T. 1839-41]. On October 16, 1996, the Plaintiff also reported that his knee was "really bothering him now that the weather ha[d] turned cold," and he requested a refill of BenGay. [T. 1840]. In an

---

[13]Lodine is a trademark for etodolac, which is a nonsteroidal antiinflamatory drug used "especially to treat arthritis." Dorland's Illustrated Medical Dictionary, at 660 and 1088 (31st Ed. 2007).

[14]Naprosyn is the trademark for naproxen, which is a nonsteroidal antiinflammatory drug "used in the treatment of pain, inflammation, osteoarthritis, rheumatoid arthritis" and other ailments. Id. at 1251 (31st Ed. 2007).

unsigned record from April 24, 1997, the Plaintiff complained of right knee pain, and requested Feldene for treatment.  [T. 1241].

On June 20, 1997, the Plaintiff was examined by Dr. H. F. Hoenig, Jr., for severe low back pain, right leg pain, and right foot pain.  [T. 423, 571, 876, 1214]. The Plaintiff reported that he had been bending over at his job to grease a vehicle, heard a "loud pop in his back," and experienced instant pain, from which he had obtained no relief for the previous two (2) weeks.  [T. 423, 571, 876, 1214].  The Plaintiff was unable to perform the back range of motion test because of the pain, and Dr. Hoenig observed pain to percussion over the spinous processes at L1-5, as well as tenderness at L1-5 to palpation. [T. 423, 571, 876, 1214].  Dr. Hoenig also noted that a knee jerk was absent on the right knee, due to the previous patellectomy, and that ankle jerks were absent in both lower extremities.  [T. 423, 570-71, 876-77, 1214-15].  The Plaintiff was referred to the Minneapolis VA Medical Center, but it is not clear that he went to the VAMC before July 31, 1997.  [T. 423, 571, 401, 877, 1215].

On June 25, 1997, the Plaintiff was again examined by Dr. Hoenig, who completed a Compensation and Pension Exam Report at that time.  [T. 403, 1246]. Dr. Hoenig recounted the Plaintiff's history of a motor vehicle accident, skin grafts due to burns, and the 1988 x-ray diagnosis of degenerative joint disease in the right

knee, but with no ligament problems. [T. 403, 1246]. Dr. Hoenig noted the Plaintiff's complaints of grinding in his right knee, and pain in his right calf, and noted that the elbow was asymptomatic. [T. 403, 1246]. Dr. Hoenig observed that the Plaintiff's posture and gait were "fairly normal," that the Plaintiff was of medium build and muscular, and that, upon a musculoskeletal examination, the Plaintiff's knees' extension was zero (0) degrees bilaterally, 120 degrees flexion on the right, and 130 degrees flexion on the left. [T. 403-04, 1246-47].

Dr. Hoenig noted that all of the range of motion tests on the lumbar spine caused pain, and that palpation showed mild tenderness in the right lumbosacral paraspinal muscles. [T. 404-05, 1247-48]. Dr. Hoenig also observed that the deep tendon reflexes were unobtainable on the right knee, and that ankle jerks were unobtainable on both ankles, and that sensation was limited, in the areas of the skin grafting and scars, but nowhere else. [T. 405, 1248]. Dr. Hoenig diagnosed the following: abnormal cardiogram; hyperlipidemia, mild; smoker; hypertension; status post right patellectomy, with residuals; and status post left olecranon fracture. [T. 405, 1248].

On June 25, 1997, the Plaintiff was also examined for psychological impairments by Dr. Shashi Prakash of the VAMC, who completed a Compensation

and Pension Exam Report.  [T. 406, 1249].  Dr. Prakash noted that the Plaintiff was applying for service-connected disability benefits on account of alcoholism and depression, but observed that he had no history of treatment for depression "in his entire life," and had never taken antidepressant medications, but that he had undergone chemical dependency treatments in 1982, 1988, 1990, and in 1994.  [T. 406, 407, 1249, 1250].  The Plaintiff also reported that he had witnessed a lot of killing during his service in Vietnam, denied nightmares or flashbacks, but reported that his temperament had been getting worse over the previous ten (10) years.  [T. 406, 1249].

The Plaintiff also reported that he had been drinking heavily in Vietnam, that he had begun drinking at the age of seventeen (17), and that he "had a couple of beers every now and then" during high school.  [T. 406, 1249].  Dr. Prakash related that the Plaintiff reported his longest period of sobriety was seven (7) months, in 1994.  [T. 407, 1250].  Dr. Prakash also reported the inconsistencies between the Plaintiff's reports of his drinking habits, with the reports of his family members, and that the Plaintiff had not reported his twelve (12) arrests, or five (5) DUI arrests.  [T. 406, 1249].  Dr. Prakash noted the Plaintiff's reports of back pain, depression, and anger, and that the Plaintiff attributed his depression to a need to return to live with his

mother, and reported that, before moving to live with his mother, the Plaintiff was "pretty much at peace." [T. 408, 1251].

In his objective findings, Dr. Prakash observed that the Plaintiff was pleasant, cooperative, with no abnormal psychomotor activity, and that he was alert, oriented times three, with coherent, relevant, and goal-directed speech. [T. 408, 1251]. Dr. Prakash opined that the Plaintiff's mood was mildly depressed, and angry "secondary to his having no job, no finances, back pain, and having to live with his mother." [T. 408, 1251]. Dr. Prakash reported that the Plaintiff had an appropriate affect, a "quite logical" thought process, and that he was functioning at an average range of intelligence, had denied any suicidal ideation, and had unimpaired cognition, memory and concentration, and that his fund of knowledge was good, and his judgment and insight "seemed fair." [T. 408, 1251]. Dr. Prakash diagnosed alcohol dependence, continuous and moderate, and an adjustment disorder, with mixed emotional features secondary to being homeless and jobless, and he determined that no psychological testing was necessary, and assigned the Plaintiff a GAF of 60.[15] [T. 408-09, 1251-52].

---

[15]The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." <u>Diagnostic and Statistical Manual of Mental Disorders</u>, (4th Ed., Text Revision, 2000), at 34. On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social,

(continued...)

On June 26, 1997, the Plaintiff underwent an MRI of his lumbar spine, which found "wedging of T12 with degenerative marrow changes, as well as left lateral herniation with left neural foraminal stenosis at L4-5, as well as mild to minimal disk bulge with no evidence of canal or neural foraminal stenosis at L1-4." [T. 399, 689-91, 1237]. On June 27, 1997, the Plaintiff returned to the VAMC for a follow up, where he was diagnosed with probable myofacial strain, and prescribed pain medications, a physical therapy trial, an "ARC troph," and Piroxicam.[16] [T. 398, 1238].

On July 31, 1997, the Plaintiff was seen by Dr. Barbara F. Olson for a wellness exam. [T. 413, 570]. Dr. Olson prescribed quinine sulfate for leg cramps, diagnosed hypertension, and cramps in the Plaintiff's right calf, observed no ankle edema, and related the results of the Plaintiff's June 26 MRI, which showed wedging of the T12

---

[15](...continued)
occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning reasonably well and having some meaningful interpersonal relationships. Id.

[16]Piroxicam is a "nonsteroidal antiinflammatory drug used for treatment of rheumatoid arthritis, osteoarthritis," among other ailments. Dorland's Illustrated Medical Dictionary, at 1471 (31st Ed.).

with degenerative narrowing changes, left lateral herniation with left neural foraminal stenosis at L4-5. [T. 412, 570]. Dr. Olson also documented the Plaintiff's report that his back pain had lessened since he had presented with severe back pain on June 20, 1997, and that standing alleviated his leg cramps. [T. 412, 570]. A medical record dated July 31, 1997, reflects that the Plaintiff was taking medication for leg cramps, hypertension, and an oral fungal infection. [T. 411].

On December 24, 1997, the Plaintiff was admitted to the VAMC in Kansas City, Missouri, where he reported that he had been drinking for two (2) weeks straight. [T. 496-97]. He was examined by Dr. Sajid Hafeez on January 2, 1998, and was diagnosed with alcohol abuse, depression, hypertension, arthritis, and joint pain, and he was assessed a GAF of 30 on admission, and a 70 on discharge. [T. 498]. Dr. Hafeez related the Plaintiff's history of alcohol abuse, and the Plaintiff's report that he had been drinking because he was depressed during the holidays, and in order to relieve the pain in his right lower extremity and left upper extremity, which had resulted from his motor vehicle accident injuries. [T. 497]. Dr. Hafeez noted the Plaintiff's prior diagnoses of alcohol abuse, status "post detox and rehab x 2," degenerative joint disease, splenectomy, and surgery on the right knee and left elbow. [T. 497].

Dr. Hafeez completed a physical examination, in which he noted nothing significant, except for tremors and shaking in both upper extremities, and he noted the Plaintiff's cooperative attitude, with no psychomotor activity. [T. 497]. He also noted that the Plaintiff's speech was at a normal rate, volume, and tone, his mood was very good, his affect bright, with slow, coherent, and organized thought processes, and fair memory, concentration, insight, and good judgment. [T. 496]. The doctor also noted that, since the Plaintiff's admission on December 24, 1997, he had complained of some joint pain, for which he was prescribed salsalate, and Flexeril.[17] [T. 496]. Dr. Hafeez noted that the Plaintiff denied any suicidal ideation, and the doctor recommended activity as tolerated, prescribed thiamine, folate, mutivitamins, lisinopril,[18] ibuprofen, salsalate, and Flexeril, and discharged the Plaintiff to "SATU"[19] and vocational rehabilitation. [T. 496].

---

[17]Salsalate is "used for treatment of osteoarthritis, rheumatoid arthritis, and related rheumatic disorders." Id. at 1690. Flexeril is a "trademark for a preparation of cyclobenzaprine hydrochloride," id. at p. 725, which is "used as a skeletal muscle relaxant for relief of painful muscle spasms[.]" Id. at 463.

[18]Lisinopril is "used in the treatment of hypertension." Dorland's Illustrated Medical Dictionary. at 1080 (31st Ed. 2007).

[19]SATU appears to be a substance abuse treatment program.

On December 31, 1997, the Plaintiff presented at SATU for evaluation. The intake professional noted that the Plaintiff had diagnoses of hypertension and depression, "and is receiving treatment for both," and listed his diagnoses as alcohol dependence, major depression single, with psychosis, and hypertension. [T. 494]. In a discharge note dated January 2, 1998, Toni Putnam, who is an Occupational Therapist, noted that the plaintiff complained of right knee pain, that a physical therapist had suggested a change of shoes and the use of a cane, but that the Plaintiff would not consider either, and reported that he drank alcohol "'to kill the pain.'" [T. 493]. The Plaintiff was referred to a pain clinic, and vocational rehabilitation clinic. [T. 493].

The Plaintiff remained at SATU for several days in order to undergo substance abuse treatment. [T. 492-93]. He participated in a number of group meetings, between January 5, 1998, and January 15, 1998, including a games/sports/athletics activity, [T. 467-70, 477], a vocational rehabilitation group, [T. 454, 459, 461-63, 465], and a relapse-prevention group. [T. 431]. On January 6, 1998, the Plaintiff met with Kristy Straits-Troster, Ph.D., where he discussed his chronic pain, which was related to degenerative joint disease. Dr. Straits-Troster diagnosed joint pain in

multiple joints, and recommended a full work-up, and possible enrollment in the chronic pain group. [T. 479]. It does not appear that the work-up took place.

The Plaintiff met with a psychotherapist, Dr. V. Marcello on January 7, 1998, as part of the SATU program, where they discussed the Plaintiff's plan for the future. [T. 476]. The Plaintiff saw Dr. Marcello, again, on January 8, 1998, where they discussed his efforts to plan for the future, as well as the relationship between his past and substance use, identifying feelings of loss and grief, and the anniversary of the death of two (2) of his children as triggers for his substance use. [T. 464]. The Plaintiff again saw Dr. Marcello on January 13, 1998, where they discussed the importance of continuing therapy, in order to prevent a relapse into substance abuse, and to prevent depression. [T. 451]. He also met with a staff physician, Dr. G. Clark, on that same day, in order to discuss medication refills for the treatment of his degenerative joint disease and hypertension, as well as quinine for muscle relaxation. [T. 452]. The Plaintiff "denied any problems with depression or mood swings," and he reported that he was not taking any psychotropic medications. [T. 452]. The Plaintiff successfully completed the SATU program on January 15, 1998. [T. 429].

      2. <u>Medical Records After Alleged Onset Date of September 1, 1998</u>.

On September 24, 1998, the Plaintiff underwent an intake medical screening, at the Montana State Prison, where he reported high blood pressure, which was being treated with Indapamide, that his last alcohol intake had been in February of 1998, [T. 1835], and his history of joint problems, arthritis, and back pain. [T. 1837-38].

On the Montana State Prison Mental Health Screening Form, the Plaintiff reported a prior diagnosis of PTSD, and that he had previously been hospitalized at a "psychiatric or state hospital." [T. 1834]. On that Form, he also reported that he had never taken psychiatric medication, and had no history of psychotherapy or counseling. [T. 1834]. However, on September 28, 1998, the Plaintiff underwent the second level of the mental health screening, where he related that he had undergone a Court-ordered evaluation, which had not diagnosed PTSD, and that he experienced some dreams of his combat experience, with which "he d[id] o.k.," but had no other complaints. [T. 1831]. The Plaintiff also reported that he had not taken psychiatric medication, except for one (1) year in or about 1985, when he took Prozac for depression, which, he reported, helped. [T. 1831]. It was noted that he required a "med referral" under the "Medical" portion of the Form, but that he required only routine monitoring for mental and dental health. [T. 1836].

In a medical examination completed on September 25, 1998, the Plaintiff reported high blood pressure, and a history of trauma to his right knee, with recurrent pain, and he was cleared for work, with restrictions on repetitive climbing, distance walking, and prolonged standing.  [T. 1833].  The examiner noted that all of the Plaintiff's exams, including his back and joint range of motion, were normal.  [T. 1832].  On October 14, 1998, the Plaintiff was seen by Sullivan, who is a Certified Physician Assistant, with complaints of chronic pain in his low back and right leg.  [T. 1829].  Mr. Sullivan prescribed "Seldene."[20]  [T. 1829].

On November 4, 1998, the Plaintiff was seen by Sullivan, for cramping pain in his right leg which, he reported, did not "happen all the time, just occasionally if he happen[ed] to overuse," and that it went away spontaneously.  [T. 1828].  The Plaintiff also reported problems with being housed on the third floor of the facility, but he voiced opposition to being moved to another unit for "special housing" for "significant physical problems."  [T. 1828].  Sullivan recommended that the Plaintiff continue with Feldene, "limit those activities that irritate his extremity," and go through the appropriate channels to be moved to a lower level.  [T. 1828].

---

[20]This is most likely a typographical error, as the records indicate that the Plaintiff was treated with Feldene.

On December 4, 1998, the Plaintiff presented with complaints of cramps in his right leg, with a pain level of 8 to 9 on a scale of 1 to 10, and the nurse observed that the Plaintiff walked with a limp, but that he was not guarding his leg, and had a full range of motion, with no redness or warmth, but slight swelling and slight crepitance with movement.  [T. 1826].

From December 8, 1998, to December 10, 1998, the Plaintiff was treated in the infirmary for diarrhea.  [T. 1823-25].  On December 9, 1998, the medical staff observed that the Plaintiff was awake, alert, and oriented to person, place, and time, [T. 1824], and he was discharged back to his unit on December 19, 1998, and was noted to be ambulatory.  [T. 1823].

 On April 11, 1999, the Plaintiff was seen in the Infirmary with complaints of a sore throat and cough, and the examining nurse noted that the Plaintiff did not make eye contact, and "did not appear to want to be" there.  [T. 1822].  On August 9, 1999, the Plaintiff was seen in the Infirmary for a blister on his left heel, [T. 1822]; on November 2, 1999, for examination of a mole, and for a Feldene prescription, [T. 1820-21]; and on November 24, 1999 for vomiting, diarrhea, chills, and headache. [T.1827].

On June 21, 2000, in a bi-annual physical exam with a Physician Assistant at the Montana State Prison, the Plaintiff reported that he had last used alcohol in 1998, and was currently taking Piroxicam, and a clinical examination resulted in normal findings. [T. 1818-19]. The Plaintiff was cleared for work, with the exception of repetitive climbing or prolonged standing. [T. 1818]. On August 9, 2000, the Plaintiff was seen by a nurse for blisters on the bottom of his feet, and reported high blood pressure. [T. 1817]. The nurse observed that the Plaintiff came to the exam with "a brisk gait," and recommended soaking his feet and applying petroleum jelly. [T. 1817].

On November 22, 2000, the Plaintiff presented at the North Texas VA with complaints of testicular swelling. [T. 543]. The physician assistant reported, under the musculoskeletal examination section, "[full range of motion] of most/all joints, no clubbing cyanosis, or edema," and a normal gait. [T. 544]. On December 11, 2000, the Plaintiff was seen, again, at the North Texas VA, to follow-up on his blood pressure. [T. 540]. The Registered Nurse noted that the Plaintiff's depression screen was negative, and that he reported exercising only occasionally -- less than three (3) times per week for thirty (30) minutes. [T. 540].

On January 16, 2001, the Plaintiff was seen by Michelle C. Honsinger, who is a Certified Physician Assistant, and was prescribed Atenolol,[21] Naprosyn, a right wrist splint, and a urology consultation. [T. 537]. The Plaintiff reported carpal tunnel syndrome, shooting pains in his right hand, and that he walked two (2) miles per day for exercise, drank six glasses of wine per day, and was taking acetaminophen for knee pain, and hydrochlorothiazide. [T. 538].

On April 2, 2001, the Plaintiff was admitted to the VAMC with complaints of testicular swelling, abdominal pain, and a synecopal episode. [T. 525]. An ultrasound

_____

[21]Atenol is "used in the treatment of hypertension and chronic angina pectoris." Dorland's Illustrated Medical Dictionary, at 173-74 (31st Ed. 2007).

of his kidneys returned normal, [T. 501], but the physicians recommended monitoring

a testicular mass. [T. 499, 588]. A CT scan of his chest revealed scattered

degenerative changes. [T. 504]. A CT scan of the Plaintiff's head was normal, except

for mild cerebellar atrophy. [T. 510]. The Plaintiff was examined by Dr. Anand

Prasad on April 3, 2001. [T. 517-20]. Dr. Prasad related that the Plaintiff reported he

had been walking home from the store when he developed a right leg cramp, testicular

pain, felt lightheaded, and blacked out. [T. 517]. The Plaintiff reported he was not

taking any medications. [T. 518]. The Plaintiff was discharged on April 5, 2001, and

was prescribed chlordiazepoxide,[22] doxycycline,[23] etodolac,[24] folic acid, lisinopril,

metoclopramide,[25] "neutra phos powder," phytonadione,[26] thiamine, and

---

[22]Chlordiapoxide is "used as an antianxiety agent in the treatment of anxiety disorders and for the short-term relief of anxiety symptoms, [and] for the relief of alcohol withdrawal symptoms." Dorland's Illustrated Medical Dictionary, at 351 (31st Ed. 2007).

[23]Doxycycline is an antibaterial medication. Id. at 572.

[24]Etodolac is a nonsteroidal antiinflamatory drug used "especially to treat arthritis." Id. at 660.

[25]Metoclopramide hydrochloride is "used as an antiemetic, as an adjunct in gastrointestinal radiology and intestinal intubation, and in the treatment of gastroparesis and gastroesophageal reflux." Id. at 1172.

[26]Phytonadione is Vitamin K. Id. at 1465.

lansoprazole.[27]  [T. 525-26].  The Plaintiff was also prescribed acetaminophen for his knee pain, and wrist splints, as well as an orthopedic hand surgeon referral, by Dr. David B. Huang, on April 2, 2001.  [T. 531-32].

On October 10, 2001, the Plaintiff presented to Dr. Dirck A. Curry with low back pain, which he reported had begun in the past two (2) or three (3) months, on a level of five (5) out of ten (10), up to a seven (7) or eight (8) out of ten (10).  [T. 565, 577].  The Plaintiff reported that nonsteroidal antiinflammatory medications did not help.  [T. 565].  Dr. Curry observed that the Plaintiff was alert, cooperative, in no apparent distress, oriented, with a good range of motion, and with equal strength bilaterally.  [T. 566, 577-78].  Dr. Curry noted pain in the lumbar sacral region, on the right side, with no palpable mass or lesion, and no significant muscle tension, normal motor control and gait, straight-leg raise to 90 degrees without pain, and the ability to oppose pressure downward on both legs.  [T. 566, 578].  Dr. Curry related that the Plaintiff was not interested in physical therapy, chiropractic care, shots to his back, or medications.  [T. 566, 578].  Dr. Curry assessed low back pain and osteoarthritis, and

---

[27]Lansoprazole is "used to inhibit the secretion of gastric acid."  Id. at 1019.

prescribed Etodolac, Methocarbamol,[28] and a physical therapy consultation, with a follow-up in six (6) to seven (7) weeks.  [T. 566, 578].

On October 19, 2001, the Plaintiff was seen by Aaron R. Sufka, who is a physical therapist, for low back pain at a level of five (5) out of ten (10).  [T. 564-65]. The Plaintiff reported that medications and exercises had been helpful, and the physical therapist noted improvement in flexibility with repetition, and tenderness with palpation at the spinous process of about L3 or L2.  [T. 564].

On January 11, 2002, the Plaintiff underwent a number of tests, which revealed gallstones, large marginal osteophytes in the thoracic spine at L2-3, and no significant degenerative disease in the right shoulder.  [T. 559-60].

On January 16, 2002, the Plaintiff was seen by Dr. Curry for a routine examination.  [T. 562].  Dr. Curry noted that the Plaintiff smelled of alcohol, but denied alcohol use, and he memorialized the Plaintiff's report of a "bad right knee." [T. 562].  Dr. Curry noted that the Plaintiff was alert, cooperative, oriented, in no apparent distress, and had a good range of motion bilaterally.  [T. 562-63].  Dr. Curry noted tenderness in the right anterior shoulder, and injected Xylocaine, and observed

---

[28]Methocarbamol is "a skeletal muscle relaxant * * * [used] in the treatment of painful musculoskeletal conditions."  Dorland's Illustrated Medical Dictionary, at 1165 (31st Ed. 2007).

that the Plaintiff's right knee was deformed due to the surgeries, and had a lot of crepitance, but noted no erythema or increased warmth in the knee. [T. 563]. Dr. Curry diagnosed cholelithiasis with mild cholecystitis, osteoarthritis, alcohol dependence, tobacco use, abdominal pain secondary to the cholelithiasis, and hypertension. [T. 563]. He recommended Tylenol for pain, and prescribed Atenolol and Lisinopril for blood pressure. [T. 564].

As of February 26, 2002, the Plaintiff was taking the following medications and supplements: lisinopril, thiamine, metoclopramide, methocarbamol, atenolol, folic acid, rabeprazole,[29] potassium, and etodolac. [T. 553-54]. The Plaintiff had been seen at the VA, in St. Cloud, Minnesota, for the following list of problems, between October 30, 2000, and February 21, 2002: abdominal pain on October 30, 2000, osteoarthrosis involving an unspecified site and lumbago on October 15, 2001, abdominal pain, alcohol dependence, tobacco use disorder, pain in shoulder joint, nausea, and weight loss on January 15, 2002, cholelithiasis on January 22, 2002, cystitis on February 20, 2002, and insomnia on February 21, 2002. [T. 555].

---

[29]Rabeprazole sodium is "used to limit gastric acid secretion in treatment of erosive or ulcerative gastroesophageal reflux disease." Dorland's Illustrated Medical Dictionary, at 1593 (31st Ed. 2007).

From January of 2002, to April 4, 2002, the Plaintiff was seen by a variety of physicians with complaints of abdominal pain secondary to cholelithiasis and cholecystitis, and he reported back and shoulder pain as well. [T.731-42]. On February 19, 2002, Dr. Curry noted that the Plaintiff smelled strongly of alcohol, and indicated that the Plaintiff was treating his musculoskeletal pain with Etodolac. [T. 740]. On April 4, 2002, the Plaintiff was seen by Dr. Curry for abdominal pain, secondary to cholelithiasis and cholecystitis, and Dr. Curry noted that the Plaintiff was taking Methocarbamol for his back pain, reported no alcohol use, and did not smell of alcohol at all. [T. 732]. Dr. Curry observed that the Plaintiff's extremities had a good range of motion with equal strength bilaterally, but that his shoulder had crepitance and pain, for which Dr. Curry administered an injection of Depo-Medrol and Xylocaine. [T. 733].

On April 9, 2002, a radiology report revealed bibasilar linear increased density, most likely due to atelectasis or fibrosis, and moderate hypertrophic degenerative change on the mid and lower thoracic spine. [T. 686]. On April 9, 2002, the Plaintiff presented to the VAMC in Minneapolis, with acute abdominal pain, and on April 10, 2002, Dr. Paul Druck removed the Plaintiff's gallbladder. [T. 815-20].

On April 24, 2002, the Plaintiff was seen by Dr. Curry for a follow up from his recent gallbladder surgery, at which time, the Plaintiff reported reduced shoulder pain, and Dr. Curry observed discomfort in the lumbar sacral region to palpation and percussion tenderness, with a stiff, slightly rigid range of motion, but a full range of motion, and equal strength in his extremities. [T. 729]. The Plaintiff also reported that he was experiencing disturbing memories from his service in Vietnam, and that he had a hard time maintaining stable employment, but that he had not used alcohol for the past few months. [T. 729-30]. Dr. Curry advised the Plaintiff to use acetaminophen for his back and joint pain. [T. 730].

On May 14, 2002, the Plaintiff was seen by Stephen J. Eisenreich ("Eisenreich"), who is a Social Worker, to discuss his future living arrangements, and an application for VA benefits and DIB. [T. 727]. Eisenreich related that the Plaintiff reported his pain level was at a zero, and that his mood was upbeat. [T. 727]. The Plaintiff also reported that he suffered from PTSD, and that he used alcohol to blunt the symptoms, but was no longer drinking. [T. 727].

On June 3, 2002, the Plaintiff called to the nurse triage line, with complaints of nausea, black stools, and vomiting blood, [T. 726], and he was seen by Dr. Haitao Ge on June 5, 2002. [T. 723]. Dr. Ge observed that the Plaintiff was alert and oriented,

in no acute distress, and had tenderness in his right knee, and reduced strength in the right leg due to knee pain. [T. 723].

On June 24, 2002, the Plaintiff presented at Urgent Care with complaints of extreme knee pain, from a week-old injury, and the triage nurse noted that the knee was swollen. [T. 812]. The Plaintiff underwent an x-ray of his right knee, which revealed joint effusion, degenerative changes, and small bony fragments at the previous patellar site. [T. 685]. An x-ray of the Plaintiff's shoulder, from October 1, 2002, revealed probable rotator cuff disease, calcification, and spurring, which were consistent with degenerative disease of the joint. [T. 682]. An x-ray on October 23, 2002, revealed advanced degenerative changes in the knee, [T. 796], and an x-ray from November 12, 2002, disclosed joint space narrowing in the right knee, and a slight increase in callus formation. [T. 785].

On June 26, 2002, the Plaintiff was seen by Dr. Curry for evaluation post-gallbladder removal, for abdominal pain, and for his recent knee injury. [T. 717]. The Plaintiff had been placed on Rabeprazole and Phenergan for stomach upset. [T. 717]. The Plaintiff reported his primary concern was his right knee pain as, most recently, his knee had given out, and he struck it against the wall and ground, causing severe pain, from which he was unable to place weight on the knee. [T. 717]. He reported

receiving injections for his knee pain,[30] and that a knee fusion had been recommended. [T. 717]. Dr. Curry observed that the Plaintiff was non-ambulatory, and that the knee was severely swollen, with palpable effusion and increased warmth due to the trauma of the injury. [T. 717, 718]. Dr. Curry assessed post-gallbladder surgery abdominal pain, which was resolving; alcohol use; right knee pain secondary to trauma; and tobacco use. [T. 719].

Also on June 26, 2002, Dr. Curry wrote a letter to the Social Security Administration requesting that the Plaintiff be excused from appearing at a Hearing in Texas, due to his recent fall, which re-injured his right knee, which Dr. Curry described as having originally been injured in Vietnam. [T. 602]. Dr. Curry stated that the Plaintiff was referred to the Minneapolis VAMC for a knee-fusion surgery, but that surgery could not take place until October of 2002. [T. 602].

On August 21, 2002, the Plaintiff presented at the Meeker County Memorial Hospital with a spiral fracture of his right femur, which he had sustained from a fall at home. [T. 605, 1159]. The Plaintiff reported that he had osteoarthritis originating from a gunshot wound, which he sustained in 1968 in Vietnam, had been on crutches, and was awaiting arthroscopic surgery for his knee at the time of the fall. [T. 605,

---

[30]There is no record of injections for knee pain in the Record.

606, 609, 1159, 1161].  The femur was repaired through surgery.  [T. 606].  During his examination at the emergency room, Dr. John W. Kluge noted that the Plaintiff smelled of alcohol, was awake, alert, and oriented.  [T. 609, 1161].  A post-operative radiology report revealed multiple calcified loose bodies in the anterior knee, consistent with osteochondromatosis.[31]  [T. 614].

The Plaintiff was also examined by Dr. Warren D. Shepard on August 21, 2002, who noted that the Plaintiff reported chronic knee pain, and "some depression, but pretty much notes he'll live with it, doesn't want to be on meds for it." [T. 611, 1163]. Dr. Shepard recorded a past medical history of hypertension, depression, alcohol abuse, splenectomy, cholecystecoty, and possible appendectomy, [T. 611, 1163], and he assessed a spiral femur fracture, alcohol abuse, chronic, and mildly acute hypertension, and previous surgeries.  [T. 612, 1164].

The Plaintiff was an inpatient at the Minneapolis VAMC after his femur surgery, from August 29, 2002, to December 9, 2002.  [T. 762].  Dr. Mark Burke completed a summary report, in which he diagnosed a right compound spiral distal femur fracture, severe degenerative joint disease, right knee, major depression, PTSD,

---

[31]Osteochondromatosis is "a condition marked by the presence of multiple osteochondromas, such as occurs in multiple cartilaginous exostoses." Dorland's Illustrated Medical Dictionary, at 1366 (31st Ed. 2007).

gastroesophageal reflux disease, and degenerative joint disease in the right shoulder. [T. 762]. In his discharge report, Dr. Curry related that the Plaintiff experienced significant pain in his right knee, which was treated with Oxycodone with Acetaminophen, and reported that the Plaintiff complained of significant symptoms of recurrent depression, which was treated with Mirtazapine,[32] and which "did seem to improve his problems with sleep and other depression symptoms," but that he also had problems associated with PTSD. [T. 762-63]. At discharge, the Plaintiff was ambulatory with crutches, his activities were not limited, and he was alert and oriented. [T. 763, 765, 766]. The Plaintiff remained off of his feet until shortly before his discharge.

On September 4, 2002, while at the VAMC, the Plaintiff met with a Recreation Therapist, to whom he reported that he considered himself a social person, and was interested in social activities, solitary activities, and outdoor activities. [T. 653-55]. On that same day, he was seen by an LPN, who noted that he was pleasant, cooperative, alert, and oriented. [T. 656]. On September 27, 2002, the Plaintiff was seen by Charlotte Depew, who is a Nurse Practitioner, and who related that the

---

[32]Mirtazapine is "an antidepressant compound unrelated to any of the classes of antidepressants." Id. at 1186.

- 44 -

Plaintiff reported feeling depressed, but that he was generally cheerful and conversant with staff and other patients. [T. 627]. On October 1, 2002, the Plaintiff was seen by Dr. Burke, who noted the Plaintiff's complaints of shoulder pain, and possible depression. [T. 625]. The Plaintiff's pain was treated with Vicodin, or hydrocodone with acetaminophen, while hospitalized. [T. 629, 631, 635, 639, 656, 672].

An August 30, 2002, physical therapy notes reported that the Plaintiff's knee extension was limited by degenerative joint disease to 15 degrees. [T. 662]. An x-ray taken on September 1, 2002, revealed degenerative joint disease in the Plaintiff's right knee. [T. 659]. On September 10, 2002, Dr. Eric R. Nelson observed that the Plaintiff's range of motion in his right knee had essentially returned to his pre-surgery level, at 15-85 degrees, where previously it had been 20-90 degrees. [T. 643]. On November 26, 2002, Sharon L. Kimble ("Kimble"), who is a physical therapist, noted that the Plaintiff had knee pain with extended ambulation, [T. 743], while a Registered Nurse noted that the right knee was swollen and hard on November 25, 2002, after the Plaintiff had more actively been using it, and he reported more pain, on November 21, 2002, when the knee was weight-bearing. [T. 774]. On October 9, 2002, Kimble observed that the Plaintiff's range of motion in his knee was 10-85 degrees, which she felt was his maximum, due to his knee and femur damage. [T. 806].

While at the VAMC in Minneapolis, the Plaintiff also participated in group therapy sessions, [T. 770-71, 777, 787, 793, 795], and was treated for depression and PTSD, [T. 778, 791, 794, 798, 801, 807, 808], and the medical staff noted an improvement with medication, [T. 795], which the Plaintiff also reported. [T. 801]. The Plaintiff also reported nightmares, several times per week, for several years, but no flashbacks. [T. 794, 798]. In his initial psychiatric evaluation with Dr. Wai Lun Chan, dated October 3, 2002, the Plaintiff reported depression symptoms periodically since 1979, and that he began drinking at that time, due to the death of two (2) of his children. [T. 808, 1149]. Dr. Chan diagnosed major depression, PTSD, and substance dependence. [T. 809-10, 1151-52].

On October 3, 2002, the Plaintiff was seen by Dr. S.M. Dysken, who concluded that the Plaintiff had symptoms of PTSD which had not been treated, "possibly because he 'doesn't believe in PTSD.'" [T. 1153]. Dr. Dysken noted that the Plaintiff's mood and affect were depressed, and the doctor diagnosed major depression, possibly recurrent, alcohol dependence, probable PTSD, and prescribed Mirtazapine. [T. 1153].

On October 17, 2002, Dr. Chan noted that the Plaintiff had begun treatment with Mirtazapine, and reported "decreased emotional lability," increased energy, and

appetite, and that the Plaintiff reported he had been lifting weights, but did not report improved sleep. [T. 1155-56]. Dr. Chan recorded the Plaintiff's report that his personality was more mellow, less abrasive, and nicer. [T. 1156]. Dr. Chan noted that the Plaintiff was more communicative and expressive, his depression was improved, and the doctor recommended continued treatment with Miratazepine, noted the Plaintiff's reports of flashbacks and vivid dreams, and referred him to the PTSD team. [T. 1156]. Dr. Dysken also observed the Plaintiff with Dr. Chan, and noted his opinion that the Plaintiff's depressive symptoms were improved on Mirtazapine, and that the Plaintiff, and the medical staff, reported that he was easier to get along with, and that the Plaintiff should be assessed for PTSD. [T. 1156].

On October 23, 2002, the Plaintiff was seen by Dr. Michael Dieperink, who is a psychiatrist. [T. 1156]. Dr. Dieperink noted that the Plaintiff reported no symptom improvements with Mirtazapine, and complained of long-standing sleep problems, including nightmares. [T. 1156]. Dr. Dieperink recommended the discontinuation of Mirtazapine, which was not discontinued, and a trial of Ambien was commenced. [T. 1157]. On December 9, 2002, Dr. Dieperink, wrote a letter in which he asserted that he had examined the Plaintiff on several occasions, and had diagnosed him with

PTSD, which was related to events that happened while the Plaintiff served in the military.  [T 696, 1148].

On February 14, 2003, the Plaintiff was seen by Clinical Nurse Specialist Betty Barrett ("Barrett"), for a mental health assessment, due to a letter he had written which indicated homicidal ideation.  [T. 707, 1133].  The Plaintiff reported that he has been depressed periodically throughout his lifetime, and that he was diagnosed, with PTSD and depression, while in the hospital after his femur fracture, and was prescribed Mirtazapine for depression.  [T. 707, 1133].  The Plaintiff also reported chronic pain, with his low back pain at a 6 out of 10, and that he was being treated with Hydrocodone and Gabapentin.  [T. 708-09, 1134-35].  The Plaintiff further reported trouble sleeping due to nightmares and pain, and a sad and depressed mood, but he reported normal memory and concentration.  [T. 707, 1133].

During the assessment, Barrett noted the suggestion of delusional thought, and the Plaintiff's report that he had previously thought of suicide, but not any longer.  [T. 708, 1134].  The Plaintiff reported that, prior to his hospitalization for the femur fracture, he had never talked with a psychiatrist, or received mental health counseling.

[T. 709, 1135]. The Plaintiff reported his longest period of sobriety was three years, between 1996 and 2000.[33] [T. 709, 1135].

Barrett reported that the Plaintiff was cooperative, but mildly belligerent, and that his motor activity was calm, but tense, and his affect was labile. [T. 711, 1137]. She noted his mood was depressed and irritable, his speech was coherent, relevant, and fluent, his thought processes intact, and that he was alert and oriented, with intact judgment, and had a Beck Depression Inventory Score of 17 which indicated a "mild depression." [T. 711, 1137]. Barrett diagnosed a major depressive order, PTSD, episodic alcohol abuse, gastroesophageal reflux disorder, hypertension, degenerative joint disease in his right knee and right shoulder, and a right compound spiral distal femur fracture, social isolation, discord with his mother, unemployment, inadequate income, pain, chronic medical problems, and she assigned a GAF of 48. [T. 711-12].

From March 20, 2003, to March 21, 2003, the Plaintiff was admitted to the VAMC, in St. Cloud, Minnesota for "detox." [T. 1117-18]. On March 28, 2003, the Plaintiff was evaluated by Patricia R. Sohler, Ph.D., for PTSD. [T. 742, 1125, 1809]. Dr. Sohler reviewed the Plaintiff's "claims folder," which included Dr. Prakash's

---

[33]The Plaintiff's report is contradicted by his treatment for alcohol abuse at SATS, from December 31, 1997 to January 15, 1998, but the Record does demonstrate sobriety for the period of his incarceration, from September of 1998, to 2000.

evaluation dated in June of 1997, and related the Plaintiff's report that he had not been hospitalized for psychiatric reasons at any time, but was placed on antidepressant medication during his stay at the VAMC, in Minneapolis, in the Fall of 2002. [T. 742]. The Plaintiff also reported knee problems since 1990, [T. 743], which he stated had prevented him from working since 1998, [T. 744]; a planned knee replacement; leg pain, which was treated with Hydrocodone; and low back pain, which was treated with muscle spasm medications. [T. 743].

The Plaintiff reported feeling depressed daily, which was worse when his knee pain was increased, depression since Vietnam, suicidal ideation, and anxiety and panic at times. [T. 745]. The Plaintiff also reported that his nightmares and sleep problems had improved with medication, and he denied problems with concentration. [T. 745-46]. Dr. Sohler observed that the Plaintiff had coherent, rational, and relevant speech, normal mood, and no evidence of intellectual deficits, and that the MMPI-2 and MCMI-2 disclosed a high level of fearfulness and suspiciousness, and strong feelings of social alienation, with significant depression and anxiety. [T. 746]. Dr. Sohler diagnosed the mental impairments of PTSD, with secondary anxiety and depression, "in partial remission on his current medication," alcohol dependence secondary to his PTSD, and a GAF of 50. [T. 746]. Dr. Sohler based her diagnosis concerning the

Plaintiff's alcohol dependence in part on family reports in the 1994 Court-ordered examination, and on the fact that the Plaintiff's dependence had surfaced during, or immediately after, his military service in the Vietnam War. [T. 747]. Dr. Sohler related that the Plaintiff reported that his knee, and not his PTSD and depression, was the cause of his inability to work. [747].

On April 10, 2003, the Plaintiff underwent surgery on his right knee to remove a femoral plate, and to insert a metal rod, in order to correct a malunion from his previous leg surgery, in August of 2002. [T. 1758, 1771, 1782-87]. In his pre-operative examination, Dr. Daren J. Wickum noted that the Plaintiff walked with crutches, that he was unable to put full weight on his right leg, and that the femur was malaligned. [T. 1772]. After the procedure, the Plaintiff was treated for pain with Percocet, Vicodin, and Tylenol #3, [T. 1750], was required to walk with crutches, [T. 1738, 1777], and was restricted from work, from lifting more than five (5) pounds, and from placing weight on his right leg. [T. 1741].

On September 15, 2003, the Plaintiff was seen by Dr. Deborah Bohn-Kietzer in order to discuss the surgery that would replace his knee. [T. 1730]. Dr. Bohn-Keitzer reported that the Plaintiff walked with difficulty without crutches, and that his right knee range of motion was from 10 to 90 degrees. [T. 1730]. Dr. Bohn-Kietzer

recommended that he wait to replace the knee until one (1) year after the Plaintiff's surgery date, due to the risks involved. [T. 1730]. From September 27, 2003, to January 11, 2004, the Plaintiff corresponded with the medical staff at the VAMC, and expressed dissatisfaction with the delay in his knee replacement surgery, as he reported an inability to walk without the aid of a walker or crutches. [T. 756-758, 285-86].

On October 14, 2003, the Plaintiff presented at the Meeker County Memorial Hospital Emergency Room, with an injury to his right leg from a fall, due to his knee giving way when he placed weight upon it. [T. 825, 829]. Dr. Janell Haiwick diagnosed a right tibial fracture, [T. 827], with significant bruising, [T. 826], and noted that the Plaintiff smelled strongly of alcohol. [T. 826]. The fracture was confirmed by x-ray, which also revealed severe degenerative changes of the knee. [T. 828]. The Plaintiff was transferred to the Minneapolis VAMC, on October 15, where Dr. Richard Schmidt noted that the Plaintiff would eventually need a "total knee replacement," and that treatment for his tibial fracture was controversial. [T. 1722]. On October 16, 2003, the Plaintiff was placed in a long cast to treat the fracture. [T. 1781].

On October 21, 2003, Dr. Jan E. Apple assessed the Plaintiff with delirium, a lack of capacity, and an inability to care for himself, and recommended treatment with haldol.[34]  [T. 1698].  On October 23, 2003, Dr. Apple observed that the Plaintiff's delirium was resolved, but that he was somewhat demanding, [T. 1684], and, on October 28, 2003, Cynthia O. Hayes, a Registered Nurse, noted that the Plaintiff was alert and oriented, very pleasant, and cooperative.  [T. 1670].  On October 27, 2003, the Plaintiff's diagnoses were listed as PTSD, osteoarthritis in the knee, benign HTN, alcoholism, esophagitis, right tibial plateau fracture, and alcohol withdrawal.  [T. 1672].  On October 23, 2003, the Plaintiff reported that his history of anxiety attacks had improved with medication, and that he was able to walk twelve (12) blocks without difficulty, prior to the most recent surgery on his right leg.  [T. 1685].

In his discharge summary dated October 27, 2003, Dr. Jonathan C. Pohland diagnosed right tibial plateau fracture, right lower lobe pneumonia, and alcohol withdrawal, and directed that the Plaintiff be "nonweightbearing" on his right leg.  [T. 1775-76].  On December 17, 2003, the Plaintiff was seen by Dr. Benjamin D. Robertson at Minneapolis VAMC in order to follow up on his right tibial fracture, and

---

[34]Haldol is the trademark for haloperidol, which is "an antipsychotic agent * * * used especially in the management of psychoses."  Dorland's Illustrated Medical Dictionary, at 828, 830 (31st Ed. 2007).

Dr. Robertson observed that the Plaintiff's extension was only to 10 degrees, and his flexion was to sixty degrees, but that the fracture was in good alignment. [T. 1666].

On October 17, 2003, the Plaintiff's medications were: atenolol, clotrimazole,[35] cyclobenzaprine,[36] gabapentin,[37] hydrocodone[38] with acetamoinophen, lansoprazole,[39] lisinopril, lorazepam, magnesium hydroxide, magnesium sulfate, mirtazapine, morphine, potassium chloride, senokot, thiamine, and zolpidem.[40]

---

[35]Clotrimazole is a topical anti-fungal. Id. at 381.

[36]Cyclobenzaprine hydrochloride is "used as a skeletal muscle relaxant for relief of painful muscle spasms." Id. at 463.

[37]Gabapentin is an anticonvulstant which is "used as adjunctive therapy in the treatment of partial seizures." Id. at 764.

[38]Hydrocodone is "a semisynthetic opioid analgesic." Id. at 890.

[39]Lansoprazole is "used to inhibit the secretion of gastric acid for the symptomatic treatment of duodenal and gastric ulcers and gastroesophageal reflux disease." Dorland's Illustrated Medical Dictionary, at 1019 (31st Ed. 2007).

[40]Lorazepam is used "in the treatment of anxiety disorders and short-term relief of anxiety symptoms." Id. at 1089-90.

Magnesium hydroxide is "an oral antacid and laxative," id. at 1111, while Magnesium sulfate is used as "an anticonvulsant in the prophylaxis and treatment of seizures," and also, "as an electrolyte replenisher," or as a laxative. Id.

Morphine is "an analgesic for relief of severe pain," id. at 1199-1200, Senokot is a "natural vegetable laxative" that "relieves occasional constipation" Physician's

(continued...)

The Plaintiff received treatment for his mental impairments at the Mental Health Partners Clinic, in St. Cloud, Minnesota, from Dr. Keith L. Brown, approximately every four (4) to six (6) months, from November 4, 2005, [T. 2129-30], again on May 10, 2006, [T. 2124], and continuing to August of 2008. [T. 2157]. The Plaintiff was consistently prescribed Mirtazapine for his depression. [T. 2308, 2361, 2382, 2450].

On August 14, 2006, the Plaintiff was seen by Jeffrey D. Wollak, who is a physical therapist, with complaints of back pain, which the Plaintiff reported as beginning after a bone graft was removed from his hip in 2002. [T. 2099]. An x-ray completed on August 3, 2006, revealed compression fractures at T12, L3, and L4, which appeared chronic, as well as large marginal osteophytes, and very severe degenerative facet disease, [T. 2103], and an x-ray on November 27, 2006, revealed bilateral neuroforaminal stenosis, and severe spinal canal stenosis at L4-L5. [T. 2134]. At an examination on February 8, 2006, the physician observed that the

[40](...continued)

Desk Reference, at 2717 (60th Ed. 2006), and Zolpidem tartrate is a sedative-hypnotic used in the short-term treatment of insomnia. Dorland's Illustrated Medical Dictionary, at 2120 (31st Ed. 2007).

Plaintiff walked with a cane, and advised the Plaintiff not to consume alcohol. [T. 2126-27].

On January 31, 2007, the Plaintiff fell while at the St. Cloud VAMC for an appointment, due to instability in his right leg. [T. 2365]. On March 5, 2007, an MRI of the Plaintiff's back revealed old compression fractures, and degenerative disc disease. [T. 2351]. The Plaintiff was an inpatient at the St. Cloud VAMC, from June of 2007, until September of 2007, [T. 2438-2657], under a temporary guardianship. [T. 2335, 2435, 2457]. On August 7, 2007, the Plaintiff was seen by Tim P. Tinius, Ph.D., for a neuropsychological evaluation. [T. 2485-2490]. Dr. Tinius observed that the Plaintiff was quite irritable, and that the testing had to be shortened due to the Plaintiff's inability to tolerate the length of time, [T. 2488], and that, overall, his intellectual functioning was average, but his frontal lobe function was "severely impaired" and, while his emotional functioning had improved since 2003, it was most likely consistent with a borderline personality disorder, and an antisocial personality disorder. [T 2489]. Dr. Tinius opined that the Plaintiff was highly likely to return to alcohol use if he were left to live on his own, [T. 2490], and diagnosed cognitive disorder, probably secondary to chronic alcohol use, and to history of possible

traumatic brain injury, PTSD, major depressive disorder, and borderline personality disorder. [T. 2489]. The Plaintiff completed a relapse prevention program. [T. 2512].

While at the St. Cloud VAMC, the Plaintiff was unable to walk for significant distances due to knee pain. [T. 2462]. An examination of his knee, on August 14, 2007, revealed a lack of 5 degrees of full extension, and flexion to 100 degrees, but a slight misalignment of the femur, and he was advised to have a total knee replacement. [T. 2477]. A radiology report of an imaging of his knee, which was dated July 18, 2007, revealed "extensive posttraumatic deformity of the knee joint, tibia, fibula, and femur," but "no change from 2004." [T. 2520]. He participated in physical therapy. [T. 2538].

On November 19, 2007, the Plaintiff was examined by Dr. Amy Schmitz-Lelwica at the Minneapolis VAMC, for an evaluation of a total knee replacement, who observed that the range of motion in the right knee was to 103 degrees, that there was crepitance, and that imagining revealed a near complete loss of joint space, and osteophyte strain. [T. 2168-69].

In early 2008, it appears that Dr. Kurt L. Fox, who is a staff psychiatrist at the St. Cloud VAMC, recommended appointment of a Fiscal Conservator for the Plaintiff, [T. 2175, 2274], and the Plaintiff was on a stay of commitment though Meeker

County, in January of 2008, and required to attend chemical dependency treatment, due a probation violation. [T. 2200, 2228]. From January 11, 2008, to January 31, 2008, the Plaintiff was an inpatient at the St. Cloud VAMC, and the medical staff observed that he was surly, [T. 2242], agitated, [T. 2239], and irritable, [T. 2272], and he consistently reported back pain at an 8 or 9 out of 10. [T. 2237, 2241, 2243, 2247, 2258, 2302]. His medical history reflects a diagnosis of borderline personality disorder. [T 2253].

An MRI of the Plaintiff's right shoulder, on January 6, 2008, after a then recent fall, revealed findings compatible with "complete full thickness right rotator cuff tear." [T. 2162-63].

       3.    <u>Assessments</u>.

On January 27, 1993, Dr. James R. Burton, who is a consulting examiner for the Social Security Administration, sent a letter to the Disability Determination Bureau in Helena, Montana, in which he related that the Plaintiff had a full, normal range of motion in his cervical spine, shoulders, and elbows, and noted a "negative" range of motion in his hips and knees, with reflexes in the knees and ankles of 2/5, and that an examination of his right knee was normal, with the exception of the absence of the right patella. [T. 878-79]. Dr. Burton concluded that

the Plaintiff would only be limited in performing "the most difficult work," and that the Plaintiff had last worked on May 18, 1992. [T. 879]. Dr. Burton did not take any x-rays of the Plaintiff's knee.

Ed Bucklew, Ph.D., completed a psychiatric review form on February 27, 1998, concluding that, based upon his review of the Plaintiff's medical records, the Plaintiff had an Affective Disorder and a Substance Abuse Disorder. [T. 355]. Dr. Bucklew felt that, without the Plaintiff's substance use, the Plaintiff had slight limitations of activities of daily living and maintaining social functioning, and seldom experienced deficiencies of concentration, persistence or pace, and that there was insufficient evidence to demonstrate any episodes of deterioration. [T. 362].

The Record contains an unsigned Residual Functional Capacity ("RFC")[41] evaluation dated October 9, 2002, which reports that the Plaintiff was capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, standing or walking about 6 hours in an 8 hour workday, sitting about 6 hours, with limited pushing and pulling in his lower extremities, climbing, kneeling, crouching, and crawling. [T. 880-82].

---

[41]RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks. See, Title 20 C.F.R. §§404.1545, and 416.945, and Social Security Ruling 96-8p.

The assessment is based upon the Plaintiff's history of loose bodies in his left elbow and right knee, removal of the right patella, early osteoarthritis in the right knee, and right ulnar neuropathy. [T. 881-82].

Karen H. Butler, Ph.D., who is a clinical psychologist, reviewed the Plaintiff's medical records, and on August 22, 2005, responded to Interrogatories propounded to her as a Medical Advisor, [T. 1953-56], and completed a Medical Source Statement on August 23, 2005. [T. 1957-59]. In her Interrogatory responses, Dr. Butler opined that the Plaintiff had mental impairments of Depression, Post-Traumatic Stress Disorder, and Alcohol Dependence, both prior to, and after, December 31, 1999. [T. 1954]. Dr. Butler concluded that the Plaintiffs' mental impairments, in combination, met or medically equaled the Listing of Impairments 12.04C2, and left him with "marked [limitation]" on his ability to concentrate, persist, and maintain pace, and she further concluded that he did not have the RFC to sustain 8 hours of work, 5 days per week, both prior to, and after, December 31, 1999. [T. 1954].

Dr. Butler noted that the Record reflected that the Plaintiff began to drink at age 17, drank moderately to heavily while in military service, and that the Plaintiff completed chemical dependency treatments in 1982, 1988, possibly 1989, 1990, and 1994. [T. 1955]. Dr. Butler reported that the Plaintiff's longest period of sobriety was

seven (7) months, excluding his incarceration for two (2) years.  [T. 1955].  Dr. Butler further observed that the Plaintiff had long-standing depression, which worsened on the anniversary of the death of his children, and when his physical condition "has had acute episodes," but that his depression had been noted to improve with medication, and abstinence from alcohol.  [T. 1955].

Dr. Butler observed that the Plaintiff's PTSD symptoms were first noted in the Record, in December of 1986, and that, like his depression symptoms, his PTSD symptoms had "waxed and waned," and improved with medication, citing to the Exhibit containing medical records covering the period from September 27, 2002, to March 28, 2003.  [T. 1955].  Dr. Butler observed that there was "no 12 consecutive month period where [the Plaintiff] was alcohol free and at a listing level for ptsd [sic] and/or depression solely."  [T. 1955]**.**  Dr. Butler also observed that, as the Plaintiff's alcohol consumption has decreased, but not stopped, "his psychiatric problems have worsened and [have] become diagnostically [illegible]."  [T. 1955].[42]

---

[42]It is not entirely clear what Dr. Butler meant by this partially illegible statement as, earlier in the same paragraph, she notes that his depression was observed to improve without alcohol, and upon further Interrogatories, she opined that the Plaintiff would not meet the Listing of Impairments absent his alcohol use.

Dr. Butler expressed the opinion that, since December of 1999, the Plaintiff's depression and anxiety had worsened as his physical condition deteriorated, and that the Record demonstrated "'[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." [T. 1956]. She further noted that, due to the Plaintiff's ongoing alcohol use, he would be an appropriate candidate for long-term residential treatment, where he could experience extended sobriety, stabilize his mental health conditions, and have a "good assessment of his sober functioning made." [T. 1956]. Dr. Butler also noted that the Plaintiff's prison records did not "suggest contact for psychiatric concerns." [T. 1956].

In her Medical Source Statement, Dr. Butler concluded that, during the relevant time period, the Plaintiff had moderate limitations on his ability to understand, remember, and carry out short, simple instructions, and to make judgments on simple work-related decisions, and a marked limitation on his ability to understand, remember, and carry out detailed instructions, due to his history of flashbacks, nightmares, and disturbed sleep. [T. 1957]. Dr. Butler also opined that the Plaintiff had moderate limitations on his ability to interact appropriately with the public, and with co-workers, and to respond appropriately to changes in a work routing, moderate

to marked limitations on his ability to respond appropriately to work pressures, and marked limitations on his ability to interact appropriately with his supervisors. [T. 1958]. Dr. Butler opined believed that the use of alcohol decreased the effectiveness of the Plaintiff's anti-depressant medications, "[could] magnify depressive symptoms, and reduce the Plaintiff's ability to tolerate frustration." [T. 1958]. According to Dr. Butler, without substance use, the Plaintiff's depressive and anxious symptoms would be reduced, but that there was no twelve (12) month period of sobriety to demonstrate such symptom reduction so as to determine his limitations under those circumstances. [T. 1959].

The ALJ, and the Plaintiff's counsel, propounded Supplementary Interrogatories to Dr. Butler. The ALJ informed Dr. Butler that she could examine a one (1) month period of sobriety so as to determine the effects of alcohol on the Plaintiff's limitations. [T.1966]. Dr. Butler referred to the time period between August 29, 2002, and December 9, 2002, and expressed the view that the Plaintiff would still suffer from Major Depression and PTSD, but that his symptoms would be reduced, and she changed her Medical Source Statement to reflect that the Plaintiff would have only a moderate impairment of his ability to interact with supervisors, and a moderate impairment on his ability to respond appropriately to work pressures. [T.

1968-69]. Dr. Butler based those findings on the staff treatment notes from the hospital staff, which reported improved sleep, improvement in other depressive symptoms, reduced anger and irritability, as well as his more cooperative attitude. [T. 1969].

In response to the Plaintiff's Interrogatories, Dr. Butler confirmed that, without alcohol, the Plaintiff would not meet the "Part C" criteria, citing to the improved depressive and PTSD symptoms, as noted in the records which included Dr. Sohler's report, and the 2002 hospital stay. [T. 1972]. Dr. Butler also concluded that the Plaintiff's limitations, which she had noted in her supplementary Medical Source Statement, would be the same, if he was not in a structured environment, and was abstaining from alcohol, and that the Plaintiff's PTSD, and alcohol dependence, were two (2) distinct mental illnesses, noting that the Plaintiff's alcohol use predated his military experience. [T. 1972].

Dr. Jared A. Frazin also responded to Interrogatories concerning the Plaintiff's physical impairments. [T. 1961-65]. Dr. Frazin concluded that the Plaintiff suffered from the following impairments, on or before December 31, 1999: degenerative arthritis of the right knee, status post patellectomy; degenerative arthritis of the left elbow, status post olecranin fracture; alcohol dependence with intermittent alcoholic

hepatitis; low back pain, with degenerative disc disease, without loss of motor or sensory function or reflexes; hypertension; tobacco abuse; a history of ataxia noted in 1988; status post splenectomy in 1994; burns, left forearm, right forearm, and right foot; PTSD; and degenerative disc disease of the right shoulder. [T. 1961-62]. Dr. Frazin concluded that the Plaintiff's impairments did not meet or medically equal any impairments on the Listing of Impairments, prior to December 31, 1999, but that, from August 21, 2002, to December 17, 2003, the Plaintiff met Listing 1.02. [T. 1963].

Dr. Frazin opined that, prior to December 31, 1999, the Plaintiff was capable of light work, with occasional bending, kneeling -- but not on the right knee -- squatting, and stair climbing, but no ladder climbing, with no overhead lifting with his right arm, no extreme temperatures, and the work must be performed in a non-hazardous environment. [T. 1965]. Dr. Frazin further believed that, most likely, at some point between 1999 and 2002, the Plaintiff's RFC decreased to sedentary work, as he experienced more problems with his right knee. [T. 1965].

4.     Other Records.

a)     The Veteran's Administration Rating Decisions.

On October 2, 1997, the Department of Veteran's Affairs issued a Rating Decision that addressed the service connection of the Plaintiff's impairments, and his entitlement to a nonservice-connected pension. [T. 272, 844, 1209]. The Decision states that the medical records, which were considered, included service medical records from 1966 to 1968; outpatient treatment reports, and inpatient hospitalization reports from the St. Cloud VA Medical Center; medical records during the period from 1974 to 1997, from a variety of hospitals and clinics; and Dr. Hoenig's examination of June 25, 1997. [T. 272, 844, 1209]. The VA found that the low back impairment, depression, and alcoholism, were not service connected, but granted a non-service pension. [T. 272-73, 844-45, 1209-10].

The decision also notes that the VA examination of June 25, 1997, revealed that the Plaintiff's depression was secondary to his "homeless and jobless situation," and that the VA had previously denied service-connection for the Plaintiff's PTSD, in 1988. [T. 273, 845, 1210, 854-55, 1594-95]. In granting a non-service-connected pension benefit, the opinion states:

> The veteran is unable to secure and follow a substantially gainful occupation due to disability. * * * The veteran is 49 years old, has a level of education reported as high school [sic], and last worked in April 1997 as a railroad maintenance worker * * * [and] [i]n addition to his low back disability and his adjustment disorder, the veteran has a history of a fractured right knee and a fractured left elbow and a splenectomy which are the result of a motor vehicle accident in November 1974.

[T. 273, 845, 1210].

The VA assessed the Plaintiff with an 80% nonservice-connected disability rating, and a 0% service-connected disability rating. [T. 274, 846]. In particular, the VA found the Plaintiff disabled to the following degrees: 40% for his low back; 30% for his adjustment disorder and PTSD; 20% for his splenectomy; 10% for his status post right patellectomy; 10% for his left elbow fracture; and 10% for his hypertension. [T. 274, 846]. In his application, the Plaintiff had reported that he had been suffering from his impairments in the right knee, left elbow, splenectomy, and from alcoholism, since 1979. [T. 850].

On October 17, 2000, the Department of Veterans Affairs sent a letter to the Plaintiff in which it delineated his nonservice-connected pension benefits. [T. 240, 603, 1198]. The letter reported that the Plaintiff's spleen removal was 20% disabling; his knee condition was 10% disabling; his limited extension of forearm was 10%

disabling; and his hypertension was 10% disabling. [T. 240, 603]. The letter also related that the Plaintiff's pension benefits became effective on May 1, 1997. [T. 240, 603].

On August 21, 2003, the Department of Veteran's Affairs issued a Rating Decision, in which it granted the Plaintiff service-connected benefits for his PTSD, anxiety, and depression, with an evaluation of seventy (70) percent, effective as of October 18, 2002. [T. 697]. The VA also denied an increase in the Plaintiff's non-service pension, and the Plaintiff's individual unemployability benefits. [T. 697]. In making its decision, the VA relied upon the claim documents; the medical treatment reports from Meeker County Hospital from August 22, 2002, through August 28, 2002; the Plaintiff's statements, which were received on September 27, 2002, and February 27, 2003; the Plaintiff's personnel records from September 16, 1966, through September 14, 1972; medical reports from the VAMC in Minneapolis, Minnesota, from August 29, 2002, to October 23, 2002; the medical records from the VAMC in St. Cloud, Minnesota, from February 14, 2003, through March 3, 2003; the

VA examination from the VAMC in St. Cloud, Minnesota, dated March 28, 2003; and the DD 214, Service Discharge Record, dated August 28, 1968. [T. 698].[43]

In a Decision dated May 14, 2004, the Department of Veteran's Affairs reversed the earlier Rating Decision, and granted the Plaintiff individual unemployability benefits, effective as of October 18, 2002, [T. 305], and assessed a disability rating of 100%, effective as of October 18, 2002, due to service-connected disabilities.[44] [T. 302]. The Decision was based on a "[r]eview of Claims File including most recent rating decisions," the Plaintiff's Notice of Disagreement of April 14, 2004, the Plaintiff's statement dated April 6, 2004, and the Plaintiff's Application of April 6, 2004. [T. 305-06]. The Decision found that the Plaintiff's

---

[43]The Record also contains a Rating Decision dated August 15, 2003, which appears to be an exact copy of the decision of August 21, 2003, for the application that had been received on October 18, 2002. [T. 1110-1116].

[44]The VA is permitted to assess full unemployability when a claimant has a service-connected impairment of at least 60%, and the rating agency has determined that the claimant is unable to secure a substantially gainful occupation. [T. 306]. Thus, the VA is permitted, by its regulations, to determine that a claimant is unemployable without determining that the claimant is totally disabled. See, Parker v. Brown, 7 Vet.App. 116, 118 (Vet.App. 1994)("[A] claim for TDUI [i.e., total disability rating based on individual unemployability] is based on an acknowledgment that even though a rating less than 100% under the rating schedule may be correct, objectively, there are subjective factors that may permit assigning a 100% rating to a particular veteran under particular facts[.]"); 38 C.F.R. §4.16.

"psychiatric disability, limited education, occupational background, and lengthy absence from employment," prevented the Plaintiff "from engaging in substantial gainful activity," and that it was unlikely that he could return to employability due to his "psychiatric symptoms alone." [T. 306].

        b)      <u>Employment Records</u>.

        The Plaintiff's earnings reports disclose that he worked from 1965 -- a year in which he made only one hundred fifteen dollars and ninety-five cents ($115.94) -- to 1992 -- a year in which he made twelve thousand four hundred fifty-two dollars and sixty-four cents ($12,452.64). By way of example, his earnings in 1985 were thirty-four thousand, three hundred ten dollars and eighty-seven cents ($34,310.87), which is representative of his usual earnings. [T. 112]. The Plaintiff had no earnings in 1993, 1994, and from 1998 forward. [T. 112.]. A Vocational Analysis, which was completed on March 8, 2004, lists his prior work as a millwright, which is a skilled and heavy position, with transferable skills of structural and mechanical fabrication, installing, and repairing. [T. 289].

        c)      <u>The Plaintiff's Reports to the SSA</u>.

        In a Disability Report dated November 1, 2000, the Plaintiff reported a limited ability to climb, stand, lift, and walk; he also reported that he would

be penalized in his Veteran's benefits if he worked.  [T. 263].  In a Disability Report dated March 21, 2001, the Plaintiff reported a worsening of his degenerative arthritis, and that he had difficulty walking, bending, or stooping for prolonged periods, [T. 234], that he could not walk, stand, or sit for long periods of time, and that he had difficulty in using his hands due to carpal tunnel syndrome.  [T. 236].  On March 29, 2001, the Plaintiff reported his medications as Hydrocholothiazide, and Atenolol, for high blood pressure, and acetaminophen, and Naproxen, for his arthritic knee pain.  [T. 243].  In a Disability Report filed on April 5, 2001, the Plaintiff stated that he could care for his personal needs most of the time, but had trouble with tying his shoe laces.  [T. 228].[45]

In an Activities of Daily Living Questionnaire dated October 1, 2000, the Plaintiff reported that he needed to perform his activities very slowly, [T. 251], that he drove, cooked, did yard work, read, groomed himself, bathed, talked on the phone and to neighbors, handled finances, and lifted weights daily; shopped, played cards or games weekly; and fished and attended church monthly.  [T. 253].  He also reported difficulty bending, walking, stooping, and extending his left arm, and reported

---

[45]In a request for Appeal of an adverse VA decision, the Plaintiff asserted that his PTSD was the cause of his unemployability, and that his "knee problems did not begin until 2001."  [T. 312].

nervousness under pressure. [T. 254]. The Plaintiff reported that he had no alcohol problems, but also that he had only one (1) DUI incident in 1992, no episodes of blackouts, tremors, or delirium tremens, and no alcohol-related work problems -- claims which are contradicted by the Record. [T. 252].

The Plaintiff met with a Social Security Administration interviewer during 2000, who noted that the Plaintiff was very pleasant and polite, and that, at both meetings, the Plaintiff denied alcohol problems, but smelled of alcohol. [T. 248]. She also observed that the Plaintiff had difficulty walking and sitting. [T. 236].

   B.   Hearing Testimony.

      The Record contains the transcripts of three (3) separate Hearings which were held by ALJs concerning the Plaintiff's application for DIB. The most recent Hearing, which was conducted on October 17, 2006, commenced with the ALJ informing the Plaintiff of his right to the assistance of counsel, or a qualified representative, which the Plaintiff waived. [T. 45]. The ALJ asked the Plaintiff to sign medical release forms, so that she could obtain medical records from August 16, 2006, to the present. [T. 47]. The Plaintiff did not object to the Record, and the ALJ proceeded with her questions. [T. 47-48].

The Plaintiff testified that he had a high school education, vocational training as an industrial millwright, a pipe fitter, and a plumber, that he was in the military from 1966 to 1969, and that he was in jail from about 1995 to 2000. [T. 48-49]. The Plaintiff testified that his right leg and knee prevented him from employment, as well as his hip, left elbow, and the deterioration of his spine. [T. 49]. He testified to a limp, an inability to stand for long periods, pain -- with side effects from medications -- and worsening symptoms since 1997. [T. 50]. As to his back, the Plaintiff testified that he required a walker for balance, that he could sleep for only two (2) hours at a time, and that he took pain medications, which helped. [T. 51-52].

He also testified that he drove, [T. 52], that he did not go out much, [T. 53], but that he fished, occasionally, in the Summer. [T. 54]. The Plaintiff testified to a 100% disability rating from the VA for approximately the past two (2) years, [T. 55], and that he had been treated for PTSD regularly, beginning in 2000, and occasionally before that, and that his treatment with Rotazaprine helped his PTSD symptoms. [T. 55]. He also testified that he lived alone, in a single-story one bedroom home, did his own grocery shopping, laundry, and cooking, most of the time, but did not do yard work. [T. 48, 56-57].

Another Hearing was also held on September 15, 2005, before an ALJ, at which the Plaintiff, the Plaintiff's mother, Dr. Franzin, and Wayne Onken ("Onken"), who is a vocational expert, testified.[46]  [T. 2008, 2010].  The ALJ began with opening remarks, and noted that there were three (3) different files submitted, and that the Plaintiff did not object to the Record.  [T. 2012].  The Plaintiff's attorney also made opening remarks, and noted that the VA Decision, which awarded the Plaintiff benefits, from April of 2002 forward, meant that the VA had determined that the Plaintiff was disabled -- by his mental impairments -- during the period of hospitalization to which Dr. Butler cited, in her opinion, that the Plaintiff would not be disabled absent alcohol use.  [T. 2018].

As to his physical limitations, the Plaintiff testified that he had been using crutches since 2000, [T. 2019], that he had been discussing a total knee replacement with his physicians since the 1980s, [T. 2019-20], that he had several surgeries on his knee prior to 1999, [T. 2021], that he used a knee immobilizer to heal after those surgeries, and that he began using a knee immobilizer continuously in the "last couple of years."  [T. 2021-22].  He testified that, in 1997, he was unable to stand for more

---

[46]Since the ALJ relied upon Responses to Interrogatories from Juletta Harren ("Harren"), a Vocational Consultant, we do not summarize Onken's testimony.

than one hour at a time, because his legs would swell, [T. 2028], that, in 1998, he would only have been able to be on his feet for one and a half hours (1½) in an 8-hour work day. [T. 2029]. He also testified that his knee swelled with more activity, such as climbing stairs or ladders, or if he put weight on it all the time, [T. 2029], and that his knee was swollen sixty (60) percent of the time during 1998. [T. 2030].

The Plaintiff also testified that, during 1998 and 1999, his back bothered him once per day, and was particularly bothersome when his knee was swollen. [T. 2030]. He testified that, while he was incarcerated, he was moved from the second floor to the first floor, because of his knee, and that he was moved from a job in the cafeteria to the plumbing shop, where he could sit rather than stand, due to his physical restrictions. [T. 2031-32].

The Plaintiff's mother testified that the Plaintiff had lived with her in Litchfield, Minnesota, in 1997 and 1998, before he went to prison in Montana. [T. 2034, 2035]. She also testified that she had some difficulty with her memory. [T. 2034]. She stated that the Plaintiff was able to care for his basic needs, but was unable to do house or yard work, because of his leg pain and swelling, [T. 2035-36], that he lived in a basement apartment, and that he had to use the railing to go up the stairs. [T. 2037-38]. However, she testified that she was unsure of when, exactly, that was, [T. 2039],

and that the railing was put in after the Plaintiff returned from prison in 2000, [T. 2040], but that he had trouble with the stairs before that time. [T. 2041]. As to the Plaintiff's mental impairments, she testified that he was easily angered, [T. 2041-42], and that he had difficulty interacting with others. [T. 2042-43].

The Plaintiff also testified that he had lost a couple of jobs prior to 2002, in Montana, due to his PTSD, and prior to his incarceration. [T. 2022-23]. The Plaintiff testified that, in particular, he had difficulty when he was required to work with others. [T. 2024]. The Plaintiff stated that he had used alcohol, since his military service, up to the present. [T. 2025]. The ALJ then asked the Plaintiff if he used alcohol as a means to cope with stress, and the Plaintiff responded that he did, in part, and that, "the other part is I just do." [T. 2025].

As to his prior work history, the Plaintiff testified that he worked for a railroad in 1997, but that he had hurt his back, and then he had owned a gravel truck with a friend, but had difficulty getting into the cab because of his knee and back, and had to end that business when he went to prison in 1998. [T. 2027-28].

Dr. Franzin testified as the neutral Medical Expert ("M.E."), and related that he had reviewed all of the available medical evidence. [T. 2043]. Dr. Franzin repeated the impairments that he had listed in his Interrogatory responses, [T. 1961, 2044], and

he cited to those Exhibits that supported his conclusions. [T. 2044-47]. Dr. Frazin

opined that the Plaintiff did not meet the Listing of Impairments for his physical

impairments, on or before December 31, 1999, because the Plaintiff had not lost motor

or sensory function due to his back pain, and because there was no "really complete

knee exam, right before the date of last insured," but that an "orthopedic [consulting

expert]," in 1993,[47] observed that the knee exam was normal, except for the missing

patella, and that the Plaintiff was incapable of more difficult tasks, but could work as

a truck driver. [T. 2048]. Dr. Frazin also based his opinion on a physical exam, that

was completed at the VAMC in 1997, and that found a "'good range of motion both

of the low back, the right knee, and the left elbow.'" [T. 2048].

Dr. Frazin then testified that, prior to December 31, 1999, the Plaintiff was

capable of light work, with walking six (6) hours per day, occasional bending,

kneeling, and squatting, but no kneeling on his right knee, and stair climbing, but no

ladder climbing, and no overhead lifting with the right arm, no extreme temperatures,

and no working in a hazardous environment. [T. 2048]. Dr. Frazin testified that he

was not aware of any treating physician's opinion to the contrary. [T. 2049]. Upon

---

[47]Dr. Frazin appears to be referencing the letter of Dr. Burton dated January 27, 1993, and included in the Record at pages 878 to 879.

questioning by the Plaintiffs' attorney, Dr. Frazin testified that he based his conclusion, that the Plaintiff could stand for six (6) hours, on the examinations of the Plaintiff that were completed in 1993, and 1997, and that noted a good range of motion, no crepitance, and that recommended no functional limitations. [T. 2054-62]. He also testified that those examinations had not included diagnoses of degenerative arthritis of the knee, [T. 2061], and that he did not recall a diagnosis of "severe" arthritis. [T. 2061]. Dr. Frazin did include degenerative arthritis of the right knee, in his list of the Plaintiff's impairments, in his Responses to Interrogatories. [T. 1961].

The Plaintiff's attorney asked Dr. Frazin about Dr. Robins' opinion, from 1988, that the Plaintiff should perform only sedentary work. [T. 2049]. Dr. Frazin recalled Dr. Robins' medical observations from October 22, 1990, but did not recall the opinion from 1988. [T. 2049-50]. Upon further questioning, Dr. Frazin opined that the functionality of the Plaintiff's knee was the most important consideration, [T. 2050, 2053, 2054], and that he did not have severe arthritis in his knee prior to December 31, 1999, and referenced the VAMC examination in 1997, which revealed a good range of motion, and made no such diagnosis. [T. 2051]. Dr. Frazin also testified that the x-ray findings may not be the same as clinical findings, [T. 2052], and that records which were 16 years old were not as relevant as more recent records.

[T. 2053]. Dr. Frazin also testified that the VA medical examination, which is dated June 25, 1997, was not a complete knee exam, and it supported his conclusions. [T. 2057-60].

The Plaintiff also testified at a Hearing before of an ALJ on July 23, 2002, that he had degenerative arthritis of the knee, [T. 144], that he could not walk on it at all, [T. 145], that he did not trust his right leg for driving, [T. 150], and that he had to lie down four (4) times a day to control his knee and back pain. [T. 151, 153]. The Plaintiff also testified that he had been using crutches for approximately three (3) or four (4) months, that he could not cook more than a can of soup, and that his mother mowed the lawn. [T. 152-154].

After the most recent Hearing, the ALJ propounded Interrogatories to Julietta Harren ("Harren"), a Vocational Consultant, who had reviewed all of the exhibits pertaining to the Plaintiff's vocational background, and who responded on January 30, 2007. [T. 2091]. In the Interrogatories, the ALJ proposed a hypothetical, which included all of the limitations of the RFC, to which Harren responded that a person with the limitations listed could not perform the Plaintiff's prior work, but could be an assembler, which is a light, unskilled position, and which encompassed some 12,500 positions in Minnesota; or a Machine Tender, which is also a light, unskilled

position, of which there were 1,317 positions in Minnesota; or as a bagger, a light, unskilled position, encompassing some 7,500 positions in Minnesota. [T. 2093]. Before the ALJ entered Harren's response to the Interrogatories into the Record, the ALJ sent the response to the Plaintiff, and gave him an opportunity to object, which he did not. [T. 2096-97].

C. <u>The ALJ's Decision</u>. The ALJ issued her decision on March 8, 2007. [T.42]. As she was required to do, the ALJ applied the sequential, five-step analytical process, that is prescribed by Title 20 C.F.R. §§404.1520, and 416.920.[48] As a

------

[48]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

<u>Simmons v. Massanari</u>, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his

(continued...)

threshold matter, the ALJ noted that, on October 15, 2000, the Plaintiff filed a protective application for disability, and for DIB, in which he alleged an amended onset date of September 1, 1998. [T. 25]. At Step One, the ALJ determined that the Plaintiff had not engaged in any work activity since 1997, and so, had not engaged in substantial gainful activity since his alleged onset date. [T. 26].

At Step Two, the ALJ examined whether the Plaintiff was subject to any medically determinable severe physical and mental impairments, including a consideration of his alcohol use. [T. 26]. The ALJ relied upon the opinion of Dr. Franzin, whom she noted is a Board-certified physician of Internal Medicine, who appeared and testified at the Hearing on September 15, 2005, and who responded to Medical Expert Interrogatories on August 25, 2005. [T. 26].

The ALJ related that Dr. Franzin concluded that the Plaintiff had "degenerative arthritis of the right knee status post-patellectomy, degenerative arthritis of the left elbow status post elecronon fracture, degenerative disc disease at L4-5, but without loss of motor or sensory functions or loss of reflexes, hypertension without organ

_____

[48](...continued)
impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy. Id. at 754.

damage, and degenerative joint disease of the right shoulder." [T. 26-27]. The ALJ also related Dr. Franzin's testimony, that in his opinion, on or prior to December 31, 1999, the Plaintiff was "limited to light work with standing/walking 6 out of 8 hours, occasional bending and squatting, no kneeling on the right knee, no climbing of ladders, no overhead lifting with the right arm, no extremes of temperature, and a non-hazardous environment." [T. 27]. The ALJ noted that the testimony was consistent with Dr. Franzin's Responses to the Interrogatories. [T. 27].

Based upon Dr. Franzin's opinions, the ALJ concluded that the Plaintiff's physical impairments resulted in more than slight function limitations, and therefore, were severe impairments. [T. 27 ]. The ALJ also noted other medical conditions, which were listed by Dr. Franzin, including tobacco abuse; history of ataxia, which was mentioned only in 1998, status post splenectomy in 1994; and burns on the left and right forearm, and right foot. [T. 27]. The ALJ concluded that those impairments were non-severe, since they did not result in any more than slight work-related limitations, and the Plaintiff had not specifically reported work-related limitations as a result of those conditions.

At Step Three, the ALJ concluded, based on "the credible and persuasive neutral medical expert testimony and interrogatory responses of Dr. Franzin," that the

Plaintiff's severe physical impairments did not meet or equal any Listing in the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4. [T. 27]. In so concluding, the ALJ acknowledged that the medical records submitted, which were dated after December 31, 1999, reflected new medical conditions, or a worsening in the Plaintiff's condition, after the expiration of his insured status. [T. 27]. The ALJ concluded that those medical records did not relate back to the Plaintiff's severe impairments on, or prior to, his date last insured. [T. 27]. The ALJ explained that, while she was sympathetic to the fact that the Plaintiff may have become disabled subsequent to his date last insured, nonetheless, pursuant to the definition within the Social Security Act, the Plaintiff must be found disabled on, or prior to, his date last insured of December 31, 1999. [T. 27].

Next, the ALJ examined whether the Plaintiff was subject to any medically determinable severe mental impairments, and whether those impairments met or equaled any Listing in the Listing of Impairments, including a consideration of his alcohol use. [T. 27]. The ALJ relied upon the opinion of Dr. Butler, who the ALJ noted, had responded to Interrogatories propounded by the ALJ, and by the Plaintiff's then-former legal counsel. [T. 27].

The ALJ related that Dr. Butler had thoroughly reviewed the overall evidence of Record, and that Dr. Butler determined that the medical records reflected diagnoses of recurrent Major Depression (Listing 12.04), Post-Traumatic Stress Disorder (Listing 12.06), and Alcohol Dependence (Listing 12.09). The ALJ noted Dr. Butler's opinion that, in combination, the Plaintiff's mental impairments equaled the criteria of Listing 12.04C(2), "to the extent that the [Plaintiff] would be unable to sustain work activities eight hours per day, five days per week, and this has continued since at least December 31, 1999." [T. 28].

The ALJ also related Dr. Butler's opinion, that the Record demonstrated that even a minimal increase in mental demands, or a change in the Plaintiff's environment, could be predicted to cause the Plaintiff to decompensate. [T. 28]. Dr. Butler also reported that the Plaintiff's depressive symptoms, and his PTSD symptoms, "have waxed and waned and have been reported to improve with medication." [T. 28]. The ALJ also related Dr. Butler's assertion, that she did not see any consecutive twelve (12) month period where the Plaintiff's PTSD and depression -- absent alcohol use -- manifested at a level which would meet or medically equal any Listing. [T. 28].

The ALJ noted Dr. Butler's Responses to follow-up Interrogatories, in which she expressed the opinion that, if the Plaintiff abstained from the use of alcohol, and "was not in a highly structured living environment, his major depression and post-traumatic stress disorder would not be medically equal in severity to the "Part C' criteria of 12.04 in the Listing of Impairments." [T. 28]. In particular, the ALJ noted Dr. Butler's comment, that abstinence from alcohol improved the Plaintiff's depressive symptoms, and that medication improved his PTSD symptoms. [T. 28].

The ALJ also considered Dr. Butler's opinion, that the medical records documented periods of sobriety, and that, if the Plaintiff abstained from alcohol use, he would be "moderately limited in understanding and remembering short and simple instructions, carrying out short and simple instructions, interacting appropriately with the public, interacting appropriately with supervisors and co-workers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting, and markedly limited in understanding and remembering detailed instructions and carrying out detailed instructions." [T. 28].

Finally, the ALJ concluded that, based upon the totality of the evidence of Record, including the Plaintiff's alcohol use prior to his military experience; the circumstances which prompted his incarceration, as well as his multiple driving while

intoxicated offenses; his chemical dependency treatment admissions; and the fact that his longest period of sobriety was seven (7) months; the Plaintiff's mental impairments of major depression, PTSD, and alcohol dependence, in combination, manifested at a level medically equal to Listing 12.04C(2), on or prior to December 31, 1999. [T. 28].

The ALJ next reported that she had placed great weight on Dr. Butler's testimony, and acknowledged the Plaintiff's earlier challenge to that testimony as speculative, and inconsistent with the evidence of Record, due to Dr. Butler's reliance on the Plaintiff's condition while hospitalized, and while under strong pain medications, in a highly structured and controlled hospital setting. [T. 28-29]. The ALJ found that challenge unpersuasive, and pointed to medical records, that were submitted, and related to the Plaintiff's incarceration in Montana, as well as the Plaintiff's testimony concerning his "active daily routine," when his alcohol use substantially decreased. [T. 29]. The ALJ concluded that Dr. Butler's opinions were based on more than only the hospitalization, and were consistent with the Record as a whole. [T. 29]. The ALJ further reported that the VA Medical Center records "assess[ed] substance dependence consistent with Dr. Butler's testimony." [T. 29].

In placing great weight on Dr. Butler's opinion, the ALJ also related that the Plaintiff did not participate in mental health treatment, counseling, or therapy, on or prior to his date last insured, and so, that there were no medical opinions, from a treating or examining mental health professional, which related to his mental functional limitations. [T. 30].

Having determined that the Plaintiff was disabled by his mental impairments, including alcoholism, the ALJ next evaluated the Plaintiff's impairments, and their severity, if he abstained from alcohol use. [T. 30]. The ALJ concluded that the Plaintiff's substance abuse disorder, absent alcohol use, would result in no more than slight functional limitations, and so would constitute a non-severe impairment, but that his PTSD, and major depression, would be severe impairments. [T. 29]. However, the ALJ concluded that those severe impairments would not meet or medically equal a Listed Impairment, absent alcohol use, and that the remaining mental impairments were "manifested by mild restriction of activities of daily living, moderate persistence or pace, no episodes of decompensation, and no evidence of the 'Part C' criteria." [T. 29].

The ALJ based her conclusion on the evidence presented by Dr. Butler's opinions, in conjunction with the overall evidence. [T. 29]. The ALJ noted Dr.

Butler's report, that the Plaintiff had long-standing depression, which was manifested by anhedonia, sleep disturbance, guilt, suicidal ideation, and some memory impairment, and that the symptoms worsened on the anniversaries of the death of the Plaintiff's two sons in a house fire. [T. 29]. The ALJ considered Dr. Butler's report, that the Plaintiff's depression had improved with medication and abstinence from alcohol, and that his PTSD symptoms waxed and waned, and had been reported to improve with medication. [T. 29]. The ALJ explained that, based upon Dr. Butler's opinions, she had reduced the Plaintiff's RFC to simple, unskilled tasks, which would involve brief and superficial contact, and low to moderate standards of pace and persistence. [T. 30].

The ALJ next considered the Plaintiff's functional limitations which resulted from his impairments, if he abstained from alcohol. [T. 30]. She noted that the Plaintiff reported, in his Daily Living Questionnaire of October 1, 2000, that he drove, cooked, did yard work, shopped, read, watched television, fixed things, cared for his own personal hygiene, attended church, played cards and games, talked on the telephone, went fishing, paid bills and handled finances, went out to eat and to the movies, and exercised. [T. 30]. The ALJ also noted the Plaintiff's testimony, at the Hearing in October of 2006, that he resided, alone, in a one-bedroom house, cooked

and shopped for himself, went fishing with his grandson, watched television, read, listened to music, and visited with his daughter, or son-in-law, when they came to check on him two (2) to three (3) times per week. [T. 30]. The ALJ determined that the Plaintiff's daily activities demonstrated only mild limitations. [T. 30].

The ALJ next considered the limitations on social functioning, that were caused by the Plaintiff's impairments, and found those to constitute a moderate limitation. [T. 30]. The ALJ pointed to Dr. Prakash's psychological evaluation, from June of 1997, which described the Plaintiff as "pleasant" and "cooperative." [T. 30]. The ALJ also relied upon Dr. Butler's note, that the Plaintiff's MMPI-II testing revealed a longstanding history of difficulty with authority figures, due to his PTSD. [T. 30]. In addition, the ALJ noted the previous testimony of the Plaintiff's mother, that the Plaintiff was irritable when he lived with her. [T. 30].

Next, the ALJ examined the limitations on the Plaintiff's concentration, persistence, or pace, which were caused by his impairments, and concluded that he experienced moderate limitation, and she reduced his RFC to simple, unskilled tasks, and low to moderate standards of persistence and pace. [T. 30]. The ALJ noted Dr. Prakash's report, from June 25, 1997, that the Plaintiff was alert and oriented times three (3), with a logical thought process and an average range of intelligence. [T. 30].

The ALJ also related the report of Dr. Hafeez, dated January 2, 1998, that the Plaintiff's immediate, recent, and long-term memory, were fair, with fair insight and concentration, and with good judgment. [T. 30]. The ALJ further determined that, if the Plaintiff abstained from alcohol, there was no evidence of episodes of decompensation, during the relevant time period, and that the evidence of Record did not demonstrate any of the "Part C" criteria. [T. 30].

Based on the foregoing, the ALJ concluded that, without alcohol use, the Plaintiff's severe mental and physical impairments, individually or in combination, did not meet or medically equal any Listing in the Listing of Impairments. [T. 30-31].

At Step Four, the ALJ assessed the Plaintiff's RFC, first considering his subjective complaints of symptoms under the standard enunciated in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §§404.1529, and 416.929. [T. 31]. The ALJ noted the Plaintiff's report that he has been unable to work since September 1, 1998, due to pain in his back; pain in his right leg, which causes him to limp, and which prevents him from standing for prolonged periods; and pain in his right hip. [T. 31]. The ALJ also noted the Plaintiff's testimony, that he is unable to work because of a steel rod in his leg, hip pain, spurs and deterioration in his spine, and pain and limitation in his right elbow,

and that he takes pain medication, which results in occasional drowsiness, has needed to use a walker for two (2) years prior to the Hearing in October of 2007, and has had significantly increased pain since 2002 or 2003. [T. 30].

The ALJ considered the Plaintiff's testimony, that he has no strength in his elbow, and that he sleeps for only two (2) hours at a time because of the pain in his back, and the fact that his testimony was consistent with his testimony in September of 2005, where he reported that he cannot sit or stand for very long, has difficulty lifting, and is unable to walk any great distance. [T. 31]. The ALJ also noted the Plaintiff's Work Activity Report, which was completed in October of 2000, and in which he reported that he is limited in bending, walking, and stooping, and that he gets nervous, and performs daily activities slowly, but requires no help with personal hygiene. [T. 31].

The ALJ assessed the Plaintiff's RFC, at the relevant time, and if he abstained from alcohol, as follows:

> [B]rief and superficial contact, low to moderate standards of pace and persistence, and simple unskilled tasks at the light exertional level involving lifting/carrying 10 pounds frequently and 20 pounds occasionally, being on one's feet a total of six hours of an eight hour day, no heights, ladders, or scaffolds, no use of foot pedals on the right, no crouching and crawling, no exposure to extremes of

> temperature and humidity, no over-the-shoulder work on
> the right, minimal (one sixth of the time) bending, stooping,
> twisting, and climbing, and an alcohol free environment.

[T. 31-32].

In her assessment, the ALJ found that the Plaintiff's, and his mother's, testimony was credible, that he has been subject to "a degree of pain and physical and mental functional limitation during the pertinent period in this case," and she expressly stated that she had accounted for those circumstances by reducing his RFC. However, the ALJ determined that she could not find the Plaintiff incapable of work activity, due to "significant inconsistencies in the record as a whole." [T. 32].

The ALJ concluded that the overall medical evidence, and the Plaintiff's course of treatment, did not demonstrate mental or physical abnormalities which could be expected to result in limitations beyond those included in her RFC. Specifically, the ALJ pointed to the Plaintiff's report, in a mental health screening, at the Montana State Prison, in September of 1998, that he had never been on medication for mental, emotional, or behavioral problems, that he was not in outpatient psychotherapy, or counseling, for mental, emotional, or behavioral problems, and that he had not had suicide attempts or thoughts, nor had he heard voices. [T. 32]. The ALJ noted that the Plaintiff reported that he had undergone a Court-ordered psychological evaluation,

due to a criminal offense, and that he had received a clean bill of health, with no diagnosis, and that he reported he was "doing okay even with some dreams he continued to have." [T. 32].

The ALJ placed particular emphasis on the fact that, while incarcerated in Montana State Prison through his date last insured, the Plaintiff did not present to the Infirmary with any mental health symptoms, nor did he seek mental health treatment, therapy or counseling, and did not use psychotropic medication. [T. 32]. The ALJ further noted that the Plaintiff did not require mental health hospitalizations, or any presentment at an emergency room, due to mental health symptoms. [T. 32].

The ALJ concluded that the medical evidence of overall treatment showed the lack of mental health treatment, counseling, or therapy, and the absence of medication on, or prior to, his date last insured, as well as the medical records from after his date last insured, which disclosed that his depression and PTSD symptoms improved with medication, and supported her RFC. [T. 32]. While the ALJ reported that she had "given the [Plaintiff] the benefit of the doubt," since he was diagnosed previous to his alleged disability onset date, and because, after his date last insured, he did seek out mental health treatment, she concluded that the evidence of Record was not consistent with his assertions of disabling mental functional limitations. [T. 32].

The ALJ also related the results of Plaintiff's Court-ordered Psychological Evaluation, which is dated December 24, 1994, and which concluded that the Plaintiff did not suffer from a mental disease or defect, but determined that alcohol may have influenced his behavior, by increasing his impulsivity and decreasing judgment. [T. 32]. The ALJ noted that Evaluation's finding that the Plaintiff "clearly had longstanding problems with alcohol abuse and that his alcohol use was voluntary in nature with little motivation to change his pattern of use." [T. 32]. The ALJ further referred to the Plaintiff's admission to the VA Medical Center, on December 24, 1997, and discharge on January 2, 1998, at which time he was diagnosed with alcohol abuse and depression, and was assessed a GAF of 70 upon discharge. [T. 32].

The ALJ next addressed the Plaintiff's then-former counsel's argument, that the VA Administration Evaluation, which had been completed by Dr. Sohler, from March of 2002, and which concluded that the Plaintiff's alcoholism was secondary to his PTSD, demonstrated that his alcoholism was not a contributing factor that should be material to his disability. [T. 33]. The ALJ discounted the probity of that evaluation, since it was completed "several years after the date last insured" and was in conflict with Dr. Butler's opinion, "who reviewed the overall evidence regarding [the Plaintiff's] alcohol use prior to his military experience, which caused his post-

traumatic stress disorder, and his excessive alcohol use after his Vietnam experience."

[T. 33]. The ALJ concluded "that even if claimant's alcohol use is disregarded, the

overall evidence of record reflects that his remaining mental impairments as well as

his physical impairments do not result in disabling functional limitations." [T. 33].

The ALJ specifically discussed the Plaintiff's use of psychotropic medication, and

noted that, at the Hearing in October of 2006, the Plaintiff testified that his

medication, which he has been taking since 2000, "makes him 'not so depressed' and

'not as jumpy'." [T. 33]. The ALJ noted that the Plaintiff had reported no side effects,

and that, considering the dosage, the side effects and effectiveness of his medication,

the RFC did not need to be further reduced. [T. 33].

Next, the ALJ discounted the credibility of the Plaintiff's subjective complaints

of the symptoms which he related to his physical impairments, and found them to be

inconsistent with the objective medical evidence, and the overall course of treatment,

as well as the dosage, effectiveness, and side effects of his medication, which she

found were all consistent with the RFC. [T. 33]. The ALJ pointed to Dr. Hoenig's

medical report of May 27, 1997, which recounted that the Plaintiff's motor vehicle

accident and injury history, and reported that, in 1988, an x-ray had diagnosed

degenerative joint disease of the right knee, but that no ligament problems were

identified, and that, though the Plaintiff complained of grinding in the right knee, and a cramping of the right calf, Dr. Hoenig observed that his gait was normal, and his left elbow was essentially asymptomatic.  [T. 33].[49]

The ALJ also considered Dr. Hoenig's medical report of June 20, 1997, where the Plaintiff reported back pain, and that, upon examination, the Plaintiff's range of motion was limited with pain of percussion over the spinous processes at L-1 through L-5, and on palpation of the paraspinal muscles on the right.  [T. 34].  As to the Plaintiff's knee, Dr. Hoenig observed that his knee jerk was normal on the left, and absent on the right, secondary to the Plaintiff's right patellectomy. [T. 33].  The ALJ acknowledged the objective medical evidence, which correlated to degenerative disc disease in the spine, but noted Dr. Jeffrey Barkmeir's report of June 26, 1997, which disclosed that there was a mild disc bulge, with a mild right paramedian posterior osteophyte, at L5-S1, but no evidence of neural foraminal or canal stenosis.  [T. 34].[50]

_____

[49]We note that the ALJ inaccurately recorded the date of Dr. Hoenig's examination, which actually occurred on June 25, 1997.  Nonetheless, the ALJ's recitation of the examinations findings was accurate.

[50]The ALJ did not include in her opinion that Dr. Barkmeir's report revealed wedging of T12, with degenerative marrow changes, as well as left lateral herniation with left neural foraminal stenosis at L4-5, [T. 399], nor the diagnosis of myofacial strain.  [T. 398].

The ALJ also pointed to the medical reports from the Plaintiff's incarceration at the Montana State Prison. In particular, the ALJ noted the Plaintiff's physical examination, upon his admission to the Montana State Prison on September 25, 1998, in which there were no abnormal findings on a neurological examination of reflexes, range of motion of joints, extremities, or range of motion of the back, and on the basis of which, the Plaintiff was cleared for work, with the exceptions of no repetitive climbing, no distance walking, and no prolonged standing. The ALJ also noted the Plaintiff's visits to the Infirmary, on October 14, 1998, November 4, 1998, in December of 1998, and on December 10, 1998. [T. 34]. On October 14, 1998, he reported chronic low back and right leg pain, was assessed with chronic degenerative disease of the right hip, leg, and back, and prescribed "Seldene." [T. 34]. On November 4, he was "really dissatisfied with his housing situation," and had been prescribed medication for his medical complaints. [T. 34]. In December of 1998, he reported pain and cramping in his leg but, upon examination, no cramping was noted and, although the Plaintiff walked with a limp, the examiner noted no guarding, swelling, redness, or warmth and, as well, the Plaintiff displayed a full range of motion. [T. 34]. She noted that the Plaintiff had presented with complaints of diarrhea, but that, on December 10, 1998, Sullivan reported that there were no

objective findings which were compatible with the Plaintiff's complaints, and that no disease was found. [T. 34].

The ALJ made particular note of the fact that, after December 10, 1998, the Prison Infirmary records do not show that the Plaintiff sought out any medical treatment for his impairments, and that a physical examination, on June 21, 2000, which included an examination of his neck, abdomen, groin, back, extremities, flanks, joints, range of motion, neurologic reflexes, and other body systems, was entirely normal, and he was cleared for work with the same limitations as he had in September of 1998. [T. 34].

As to the Plaintiff's back, the ALJ noted that radiographic evidence of his lumbar spine revealed only mild degenerative disc disease, with no evidence of nerve root impingement, and no evidence of ongoing neurological losses. [T. 34]. The ALJ further concluded that the Record did not demonstrate significant ongoing limitations from his degenerative joints disease, pointing to the ten (10) degree difference in the range of motion between the right and left knees, and that the Plaintiff's left elbow was asymptomatic, and there was no evidence of ongoing treatment for a right shoulder injury, during the relevant time. [T. 34-35].

Ultimately, the ALJ concluded that the course of medical treatment for the Plaintiff's physical impairments, which was minimal and conservative, was inconsistent with the Plaintiff's subjective complaints of "severe intractable disabling pain" and functional limitation. [T. 35]. Specifically, the ALJ noted the Plaintiff's treatment with over-the-counter medications, and no reports of side effects, and that he did not require hospitalization, did not present at an emergency room, did not use a TENS unit, surgery, biofeedback, or attend a pain clinic. [T. 35]. The ALJ further concluded that the objective medical evidence was entirely consistent with Dr. Franzin's Responses to Interrogatories, again emphasizing the date last insured, of December 31, 1999. [T. 35].

Next, the ALJ specifically discussed the weight that she afforded the medical opinions of Record, pursuant to Title 20 C.F.R. 404.1527, and Social Security Ruling 06-3p. [T. 35]. As to the Plaintiff's mental impairments, the ALJ reported she had placed great weight on Dr. Butler's opinions, because she had reviewed the "full longitudinal evidence of record," responded to multiple Interrogatories, and her responses were consistent with the Record. [T. 35]. The ALJ again discussed the Plaintiff's objection to the weight placed on Dr. Butler's opinions, and reiterated that

Dr. Butler's opinions demonstrated that she had considered the entire Record, and not simply the Plaintiff's period of hospitalization. [T. 35].

As to the Plaintiff's physical impairments, the ALJ reported that she had placed great weight on the Interrogatory Responses of Dr. Franzin, because they were consistent with the overall medical evidence from the Montana State Prison, where the Plaintiff had been incarcerated from the amended onset date through the last date insured, and his treatment before and after the date last insured. [T. 36]. The ALJ noted the Plaintiff's prior challenge to Dr. Franzin's opinions, because the doctor was unable to specifically cite the Exhibits that he relied upon in his testimony and, as the Plaintiff's counsel asserted, had relied only upon a State Agency opinion. [T. 36]. The ALJ observed that Dr. Franzin's Interrogatory Responses cited to multiple medical impairments, before and after the date last insured, and found that those references demonstrated the doctor had reviewed the entire Record. [T. 36]. The ALJ also noted that her RFC was reduced beyond Dr. Franzin's opinion, in order to give the Plaintiff the benefit of the doubt with respect to his subjective complaints. Id.

The ALJ further observed that, while she agreed with the ultimate conclusion of the State Agency psychological consultant opinions, she had placed little weight

on their specific limitations, as they did not observe the claimant, hear his testimony, or consider the medical records submitted after their review. [T. 35]. For the same reasons, the ALJ placed little weight on the State Agency physical consultant opinions, which were rendered initially, and upon consideration. [T. 36].

The ALJ also specifically addressed Dr. Robins' medical opinion, in 1987, that the Plaintiff's work should be sedentary, and noted that the Plaintiff's reported activities of daily living, the lack of neurological findings, and the absence of sensory or reflex loss, as well as the minimal treatment sought by the Plaintiff, were inconsistent with a finding of sedentary work, and therefore, that she placed "little weight on the one-time opinion rendered ten years prior to the alleged onset date." [T. 36].

The ALJ afforded great weight to the opinion of Sullivan, who she acknowledged to be a Physician Assistant, and not a treating or examining physician, because he saw the Plaintiff, on a consistent basis, during his incarceration, and his opinion that restricted the Plaintiff's climbing, distance walking, and prolonged standing, was consistent with the medical evidence of Record, and his examination notes. [T. 37]. The ALJ placed special emphasis on the point that no treating physician, or other acceptable medical source, "imposed any work related functional

limitations beyond those set forth by the [ALJ] during the relevant period in this adjudication." [T. 37].

The ALJ also explicitly addressed the Veteran Administration's disability ratings, and acknowledged the District Court's, and Appeals Council's Remand Orders. [T. 37]. The ALJ stated that she had afforded the VA disability finding little weight, because the documents, that were submitted, did not cite objective medical evidence, or contemporaneously generated medical records, for the relevant period of time, and that the percentage of disability found was not consistent with the contemporaneous medical records, course of treatment, Plaintiff's testimony, or the records dated before or after the date last insured. [T. 37].

The ALJ also considered the observations of third parties. In particular, the Social Security Administration's representative noted that, on November 7, 2000, the Plaintiff was neatly dressed, well-groomed, extremely polite, and very pleasant, and denied an alcohol problem, but that, on two (2) subsequent occasions, the Plaintiff smelled of alcohol. [T. 38]. From those observations, the ALJ concluded that the Plaintiff was capable of brief and superficial social interaction, and noted that the observations were consistent with the assessment of excessive alcohol use. [T. 38].

The ALJ also discounted the testimony of the Plaintiff's mother, from September 15, 2005, finding that the testimony was sincere, but that it was inconsistent with the medical evidence, as there was no showing in the medical evidence that, during the relevant period, the Plaintiff was prescribed a cane or crutch. [T. 38]. The ALJ noted that the RFC was consistent with the testimony of the Plaintiff's mother, as to his irritability, moods, and concentration problems. [T. 38].

The ALJ also considered the Plaintiff's work history, which she reported as demonstrating that the Plaintiff worked in only three (3) years after 1992, earning at most $4,730.00, and that he had not sought out employment, or sought any vocational placement services. [T. 39]. The ALJ noted that the Plaintiff's receipt of VA disability benefits during that period, and his anticipation of receiving DIB, may have created a disincentive to employment, and that the Plaintiff's work history did not weigh in favor of his credibility. [T. 39].

Completing Step Four, the ALJ relied on the Responses to Interrogatories of Harren, the Vocational Rehabilitation Consultant, who reported that the Plaintiff's past relevant work was as a millwright, which is a skilled and heavy exertional position. [T. 39]. The ALJ inquired of Harren whether a person with the Plaintiff's RFC could perform that past relevant work, and Harren responded that he could not,

and that the past relevant work would not impart any transferable work skills. [T. 39]. Accordingly, finding Harren to be credible and persuasive, the ALJ found that the Plaintiff was not capable of his past relevant work. [T. 39].

At Step Five, the ALJ acknowledged that the burden had shifted to the Social Security Administration, to demonstrate that the Plaintiff was able to perform other jobs, which existed in significant numbers in the regional or national economy, accounting for the Plaintiff's age, education, and work experience. [T. 39]. The ALJ noted that, on or before December 31, 1999, the ALJ was a "younger individual to a person closely approaching advanced age" with a high school education and no transferable work skills. [T. 39]. The ALJ inquired of Harren whether a person of the Plaintiff's age, education, work experience, and with his RFC, could perform any other jobs in the regional or national economy, and Harren responded that such a person could perform occupations such as a light, unskilled assembler, of which there are 12,500 jobs in Minnesota; as a light, unskilled machine tender, of which there are 1,317 jobs in Minnesota; and a light, unskilled bagger, of which there are 7,500 jobs in the State of Minnesota. [T. 40].

In addition, Harren reported that those positions had a specific vocational preparation rating of one, and she confirmed that they are performed in today's

economy as is generally described in the Dictionary of Occupational Titles, and that she had relied on that source, as well as the Selected Characteristics of Occupations, the Occupational Outlook Handbook, the Occupational Employment Quarterly for the State of Minnesota, and the Minnesota Department of Economic Security Research and Statistics, as well as O-Net, in her Responses. [T. 40]. The ALJ found Harren's Responses to be credible, persuasive, and consistent with the Dictionary of Occupational Titles. [T. 40].

Finally, based on the above analysis and findings, the ALJ concluded that the Plaintiff was not disabled at the relevant time, if he abstained from alcohol use, and therefore, that he is not entitled to disability or DIB pursuant to Sections 216(I) and 223(d)(2) of the Social Security Act. [T. 40, 42]; see, Title 42 U.S.C. §§216(I) and 223(d)(2).

## IV. Discussion

A.    Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law, and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more

than a mere search for the existence of evidence supporting the Commissioner's decision. See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, substantial evidence "is less than a preponderance,

but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it

simply because substantial evidence exists in the record that would have supported a different outcome, <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record <u>de novo</u>. See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

      B.   <u>Legal Analysis</u>. In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

      1.     That the ALJ's determination, that the Veteran's Administration rating decisions were entitled to little weight, is not supported by substantial evidence on the Record as a whole;

      2.     That the ALJ's finding, that alcohol use is a contributing factor material to the determination of disability, is based on an error of law, and not supported by substantial evidence on the Record as a whole;

      3.     That the ALJ erred in her formulation of the hypothetical question to the Vocational Expert; and

4.     That the ALJ's credibility findings are not supported
                           by substantial evidence on the Record as a whole.
See, <u>Plaintiff's Memorandum in Support</u>, supra at p. 3.

We address each contention in turn.

                    1.     <u>The ALJ's Treatment of the VA Rating Decisions</u>.

                    The Plaintiff argues that the ALJ gave too little weight to the VA

Rating Decisions because, as he argues, the ALJ improperly considered the Rating

Decision of August 23, 2003, which denied the Plaintiff an 100% disability rating, but

which was reversed by a later decision, which awarded benefits at 100%, for his

psychiatric symptoms.  See, <u>Plaintiff's Memo</u>, at p. 45.  The Plaintiff further argues

that the ALJ misunderstood that the VA decision of total disability, since October of

2002, related only to his application date, and was not a determination of an onset

date.  See, <u>Plaintiff's Memo</u>, at p. 46.  The Plaintiff also argues that the ALJ

erroneously ignored a 1997 Rating, which had concluded that the Plaintiff was "totally

disabled."  <u>Id.</u> at p. 46.

     We find no merit in the arguments raised, and find that the ALJ gave proper

consideration to the VA's disability rating.  While "a disability determination by the

VA is not binding on an ALJ considering a Social Security applicant's claim for

disability benefits," such determinations "are entitled to some weight and must be

considered in the ALJ's decision." <u>Morrison v. Apfel</u>, 146 F.3d 625, 628 (8th Cir. 1998), citing <u>Jenkins v. Chater</u>, 76 F.3d 231, 233 (8th Cir. 1996), and <u>Wilkins v. Callahan</u>, 127 F.3d 1260, 1262 (10th Cir. 1997); see also, <u>Marsh v. Apfel</u>, 23 F. Supp.2d 1073, 1079 (D. Minn. 1998). We find that, here, the ALJ carefully considered the VA Rating Decisions, as well as the medical evidence upon which the Rating Decisions were based, and appropriately articulated her valid reasons for discounting those Decisions.

In particular, we find that the Plaintiff, and the Commissioner, have misread the ALJ's decision, and further find that, although she did not specifically name the 1997 Rating Decision, the ALJ considered and discussed that Decision. The ALJ wrote that she "acknowledge[d] that during the period at issue, the Veteran's Administration had assessed a percentage of disability for Mr. Eastvold * * * but that, per the claimant's own testimony and evidence in the record, the Veteran's Administration did not find him 100% disabled until approximately 2003, which is several years after the claimant's date last insured for entitlement to Title II benefits." [T. 37]. This is an accurate reflection of the Record. As to the "period at issue," the Record contains a letter from the Veteran's Administration, from 2000, which confirms that the Plaintiff's pension benefits began in 1997, and one Rating Decision -- the 1997 Rating

Decision -- which found that the Plaintiff was 80% disabled, and 10% disabled for his knee problems, 40% for his back, and 30% for his adjustment disorder and PTSD. [T. 274].[51]

Further, the ALJ specifically discussed the VA Medical Center evaluations from 1997 -- namely, Dr. Hoenig's physical examination, and Dr. Prakash's psychological exam, [T. 30, 34] -- as well as the balance of the Record up to 1997, which is rather obliquely referenced in the 1997 Rating Decision. [T. 1209]. The ALJ observed that the VA's determinations were inconsistent with the medical evidence of Record, for the relevant period, were inconsistent with the Veterans Administration Medical Center Records, and failed to cite to any objective medical evidence, or contemporaneously generated medical records, for the relevant time period, from 1998 through 1999. [T. 37].

Accordingly, even though the ALJ did not specifically identify the 1997 Rating Decision, by referencing the VA's ratings for the relevant period, and accurately

_____

[51]As is evident, while the VA had awarded the Plaintiff pension benefits, based on its assessment of "permanent and total" disability, see, 38 U.S.C. §§1502(a) and 1521, it is clear from the Rating Decision that, in 1997, it had not assessed a 100% rating, for the service-connected, or for the non-service-connected impairments.

reporting the substance of the ratings, in that the Plaintiff was not found to be 100% disabled during the relevant time period, as well as by explaining her reasons for discounting the Rating Decisions, and discussing the medical records upon which the 1997 Rating Decision was based, we find that the ALJ committed no reversible error in her consideration of the VA Rating Decisions, which were issued before or after 2003. See, Rodewald v. Astrue, 2009 WL 1026286 at *17 (D. Minn., Apr. 16, 2009) ("An ALJ 'considers' another agency's disability determination where the decision reflects that the ALJ reviewed and took into account the VA disability rating and the medical records upon which the disability rating was based."); Cakora v. Barnhart, 67 Fed.Appx. 983, 985 (8th Cir., June 19, 2003); see also, Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006)(no error where the ALJ "fully considered the evidence underlying the VA's final conclusion," and specifically noted an earlier VA disability rating); cf., Morrison v. Apfel, supra at 628 ("If the ALJ was going to reject the VA's finding, reasons should have been given.").

We also disagree with the Plaintiff's contention, that the ALJ did not comprehend the meaning of the 2004 VA Rating Decision, which awarded the Plaintiff full service-connected disability benefits for his mental impairments, from October of 2002 forward. The Plaintiff argues that the finding contradicts Dr. Butler's

assessment of the functional effects of the Plaintiff's mental impairments, when he refrains from alcohol use. First, we find that the ALJ considered the 2004 VA Rating Decision, and accurately determined that the Decision was not based on medical records from the relevant time period,[52] and -- contrary to the Plaintiff's assertions -- the ALJ accurately reported that the 2004 VA Rating Decision did not award VA disability benefits for the Plaintiff's mental impairments, at the 100% rate, during the time period prior to the date last insured.

The Plaintiff argues that the ALJ did not understand that the date of application is not equivalent to the onset date, but the 2004 Rating Decision specifically relates back to the October of 2002 application date, and the Plaintiff has provided no support for his argument, that the 2004 VA Rating should be viewed as evidence of disability under the Social Security Regulations before 2002 -- a period of time that the Rating does not address. See, e.g., White v. Comm'r of Social Security, 572 F.3d 272, 283 (6th Cir. 2009)(finding of disability after date last insured did not necessarily lead to conclusion of disability before date last insured).

---

[52]The Rating Decision of August 21, 2003, relied on medical evidence from August 22, 2002, through March 28, 2003. [T. 698]. The reversal of that Rating Decision, on May 28, 2004, does not list the medical records that were relied upon by the VA. [T. 305-06].

We recognize the importance that VA disability benefits play in assisting past military servicemen with incapacitating injuries, and illnesses, in recognizing, in meaningful and tangible ways, our nation's gratitude, and indebtedness, to those who have served with devotion to duty, but the eligibility for such benefits is determined by the VA, and we have been presented with no authority that the VA ratings would have either qualified the Plaintiff for benefits under any Listed Impairment, or at any other Step in the applicable sequential analysis. While we acknowledge some facial inconsistency, which arises from the VA's finding that an individual is totally disabled, when the same individual is denied Social Security benefits, the basis for different rulings can be explained by the differences in the underlying Records, and opinions presented, and by different purposes served by the distinctive standards of disability ratings.

Here, the Record supports the ALJ's decision, and the ALJ did not ignore, but rather, fully considered, the VA's ratings of the Plaintiff. As a consequence, given our independent review of the entire Record, we find no reversible error on this point. See, <u>Lacewell v. Barnhart</u>, 123 Fed.Appx. 243, 245 (8th Cir. 2005)(affirming a denial of Social Security benefits, notwithstanding a contrary VA disability award); <u>Peterson v. Astrue</u>, 2008 WL 4323717 at *21 n. 7 (D. Minn., September 18, 2008).

2. <u>Whether the ALJ's finding, that alcohol use was a contributing factor, was contrary to law and unsupported by substantial evidence on the Record</u>.

The Plaintiff's challenges, he asserts, are based on both legal and factual grounds, to the ALJ's determination that the Plaintiff's substance abuse was a material contributing factor to the determination of disability. Specifically, the Plaintiff maintains that the opinion of Dr. Butler, that the Plaintiff would not be disabled absent alcohol use, was improperly based upon only a short period of sobriety, during a hospital stay in 2002, and that such short-term periods of relief from symptoms do not demonstrate non-disability under Eighth Circuit law, particularly because a hospital is a controlled environment, that is likely to improve the symptoms of mental impairment. See, <u>Plaintiff's Memo</u>, at pp. 50-52. The Plaintiff also argues that the Record does not support a finding that his symptoms had greatly improved during his hospital stay in 2002, as demonstrated by the 2004 VA Rating Decision, which awarded benefits for the period he was hospitalized. <u>Id.</u> at p. 52. While couched in terms of legal error, the arguments contend that the ALJ's decision is not supported by substantial evidence, which is a factual inquiry. See, <u>Vester v. Barnhart</u>, 416 F.3d 886, 891 (8th Cir. 2005)(applying substantial evidence standard to evaluation of determination that alcoholism was a material factor).

Under Title 42 U.S.C. Section 423(d)(2)(C), "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subchapter) be a contributing factor material to the Commissioner's determination that the individual is disabled." The Federal Regulation, which governs this determination, provides as follows:

> (1)    The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2)    In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
>> (I)    If we determine that your remaining limitations would not be disabling, we will find that your drug addition or alcoholism is a contributing factor material to the determination of disability.
>>
>> (ii)    If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction and alcoholism, and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §416.935(b).

Under this framework, "[o]nly after the ALJ has made an initial determination 1) that [a claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may he then reach a conclusion on whether [a claimant's] substance use disorders are a contributing factor to the determination of disability." Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003). If the process outlined by Section 404.1535(b) "proves indeterminate, an award of benefits must follow." Id. at 693 and 695. At the outset, we find that the ALJ properly followed the prescribed step-by-step analysis.

In Pettit v. Apfel, 218 F.3d 901, 903 (8th Cir. 2000), the Court held that it is the Plaintiff's burden to demonstrate the existence of a disability absent alcoholism. The Court, in Vester v. Barnhart, supra at 888, reiterated the burden of proof as follows: "In the determination whether the substance abuse is 'material' the claimant has the burden of demonstrating that she would still be disabled if she were to stop using drugs or alcohol." However, as the Court had previously clarified, in Bruggeman v. Barnhart, supra at 695, the Plaintiff's burden is met where the effects of alcohol use and mental impairments cannot be disentangled -- or, "[i]n colloquial terms, on the

issue of the materiality of alcoholism, a tie goes to [the claimant]."[53]  Indeed, "active

alcoholism does not preclude a finding of disability, so long as the claimant would

still satisfy the regulatory requirements independent of the alcohol abuse."  Snead v.

Barnhart, 360 F.3d 834, 837 n. 3 (8th Cir. 2004).

Of course, "[d]etermining whether a claimant would still be disabled if he or

she stopped drinking is * * * simpler if the claimant actually has stopped."  Pettit v.

Apfel, supra at 903; see also, Brueggemann v. Barnhart, supra at 695 ("[W]hen the

claimant is actively abusing alcohol or drugs," the degree to which the limitations

would remain without such abuse, "will necessarily be hypothetical and therefore

more difficult than the same task when the claimant has stopped.").  Under such

circumstances, when the Plaintiff has a mental impairment, and also a substance abuse

disorder, if the ALJ determines that the substance abuse disorder is a material factor,

---

[53]At least one Circuit has held that this "tie-goes-to-the-claimant" philosophy, as described in the Social Security Administration's Emergency Message 92600, see, Defendant's Exhibit No. 1, is contrary to the purposes of the Regulation prohibiting the award of benefits to persons who are disabled as a result of substance abuse.  See, Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007), cert. denied, --- U.S. ---, 128 S.Ct. 1068 (2008)(holding that awarding benefits, where inconclusive evidence as to materiality exists, provides a disincentive, "because abstinence may resolve [the claimant's] disabling limitations and cause his claim to be rejected.").  Of course, we apply Eighth Circuit law.

she must "untangle[] [the Plaintiff's] history of alcoholism and mental illness with sufficient clarity and detail to support" that finding. Vester v. Barnhart, supra at 891.

As a result, when making findings about the effect of substance abuse on a determination of disability, the ALJ maintains her duty to develop a "full and fair" Record, and to support her conclusions by substantial evidence on the Record as a whole. Brueggemann v. Barnhart, supra at 695; Preslicka v. Astrue, 2009 WL 490014 at *17 (D. Minn., February 26, 2009). Importantly, the source of a substance abuse disorder is not dispositive, for the question is whether the substance abuse materially affects the determination of disability. See, 20 C.F.R. §404.1535(b)(2) (the ALJ "will evaluate which of your current physical and mental limitations, upon which [she] based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling."); see also, Preslicka v. Astrue, supra at *17; Brown v. Massanari, 9 Fed.Appx. 570, 572 (8th Cir., May 11, 2001).

First, the Plaintiff contends that the ALJ erred in placing great weight on Dr. Butler's opinion, that the Plaintiff would not meet the Listing of Impairments without his use of alcohol, because Dr. Butler relied on the Plaintiff's relatively short -- three and one-half (3½) months -- stay in a hospital, which is a controlled setting, and which

other Social Security policies suggest as likely to temporarily alleviate the symptoms of mental illness, thereby providing an inaccurate picture of how a claimant would perform in an actual work setting. See, <u>20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.00F</u>. As it is the ALJ, and not the Medical Expert, who ultimately determines whether substance abuse is material to a disability finding,[54] the Plaintiff's argument is essentially that, in determining the Plaintiff's limitations when the effects of his alcohol use are excluded, the ALJ had insufficient evidence, due to the Plaintiff's sobriety, and therefore, she erroneously determined that alcohol use is material to his disability at the relevant time period.[55]

---

[54]The Eighth Circuit has gone so far as to express doubt that the ALJ's finding must be based on medical evidence at all, although, perhaps, only where the evidence of Record demonstrates that the Plaintiff is actually partaking in activities equivalent to work, such as volunteering. See, <u>Vester v. Barnhart</u>, 416 F.3d 886, 891 (8th Cir. 2005).

[55]In support of his argument, that the adequacy of the length of the period of sobriety is a legal question, the Plaintiff cites to Eighth Circuit precedent which cautions that, in assessing mental illness alone, symptom-free periods "do not necessarily compel" a finding of non-disability. See, <u>Andler v. Chater</u>, 100 F.3d 1389, 1393 (8th Cir. 1996); <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001). The Plaintiff does not provide any authority, however, to justify extending that authority into the determination of the materiality of alcohol abuse, where the relevant policies, and case law, instruct ALJ's to examine periods of sobriety for concurrent symptoms, in the analysis of materiality, although we note that the dissent, in <u>Vester v. Barnhart</u>, supra at 892, makes essentially the same argument that the Plaintiff advances here.
(continued...)

We are not persuaded by the Plaintiff's argument, that the ALJ, and Dr. Butler, failed to consider the "structured setting" factor, as Dr. Butler specifically responded that her opinion concerned the Plaintiff's limitations outside of a structured setting, and the ALJ thoroughly discussed the evidence of Record, beyond that hospitalization, in making her determination concerning the materiality of the Plaintiff's alcohol abuse.

Moreover, the ALJ discussed, at some length, Dr. Butler's opinion regarding the effect of the Plaintiff's alcohol abuse, which was based on an improvement in his symptoms during his stay in the hospital, as being entirely consistent with the medical evidence from prior to the Plaintiff's date last insured, and after, and we find that the ALJ did not err in relying upon Dr. Butler's medical opinion. See, Rehder v. Apfel, 205 F.3d 1056, 1060 (8th Cir. 2000)(ALJ did not err in relying on treatment notes, the

---

[55](...continued)
See, e.g., Ingram v. Barnhart, 72 Fed.Appx. 631, 636 n. 30 (9th Cir., August 4, 2003)(citing the Social Security Administration's Program Operation Manual System ("POMS") §DI 90070.050(D)(3), for the proposition that, if the evidence documents a drug-free period of one (1) month, and the other impairments are not disabling, the ALJ should find the claimant not disabled); see also, Vester v. Barnhart, supra at 890 (examining symptoms during periods of sobriety); Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003)(noting that symptoms did not appear to improve during periods of sobriety).  Regardless, the Plaintiff has not demonstrated how this "legal" question differs from the substantial evidence analysis, and we find that it does not.

credibility determination, and non-treating State Agency consultants in reaching the conclusion that drug abuse was material); see also, <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016 (8th Cir. 2004)(no error where the ALJ relied on a non-examining consulting physician's opinion, as "one part of the record," which was consistent with the Record as a whole).

As the ALJ observed, and notwithstanding the VA's 2004 Rating Decision that awarded the Plaintiff benefits for his mental impairments from 2002 forward, the Plaintiff was evaluated by a two-person team of psychologists in 1994, and was determined to have no severe mental illnesses, and the Plaintiff repeatedly denied mental health problems in close proximity to the relevant time period, to the SATS staff in 1998, after his alcohol treatment was completed, and to the Montana State Prison Staff, during a period of sobriety, and by the fact that the Plaintiff required no hospitalization or other intervention for mental health needs during his incarceration. Moreover, Dr. Butler's conclusion, that the Plaintiff's depression and PTSD symptoms improved with medication, and abstinence from alcohol, is further supported by his own report to Dr. Sohler, that his PTSD symptoms improved with medication, an exhibit that Dr. Butler referenced, together with the Plaintiff's testimony to that effect; by the observations of the hospital staff that the Plaintiff's

sleep improved, and his depression symptoms ameliorated, when the Plaintiff was taking Miratazapine; by the 1989 treatment notes that reflected an intensification of the Plaintiff's symptoms when he relapsed, and their improvement with medication and abstinence; by his dramatically improved GAF score upon detoxification in late December of 1997 to early January 1998 -- from 35 to 70 over a three-day period; and by his reported daily activities in 2000.

Upon this Record, we find no error in the ALJ's assignment of weight to Dr. Butler's opinion, or in the conclusion drawn from that opinion, as corroborated by the other evidence of Record, that the Plaintiff's alcohol abuse was material to his disability. See, Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000)("'Impairments that are controllable or amenable to treatment do not support a finding of total disability.'"), quoting, Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999); see also, Talley v. Barnhart, 113 Fed.Appx. 185, 187 (8th Cir., October 18, 2004)(determination that alcoholism was material was supported by substantial evidence in the Record as a whole, where the "medical evidence showed that his most serious physical problems, as well as his depression and anxiety disorder, improved with detoxification treatment and when he stopped drinking."); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)("[E]vidence reflected that when [the plaintiff] reduced her alcohol use she was

able to conduct daily activities and perform certain jobs, confirming the conclusion that [the plaintiff's] condition improved during periods of sobriety."); Raper v. Astrue, 2009 WL 3211439 at *3 (E.D. Ark., September 28, 2009)(alcohol use was material where the evidence demonstrated that, as the plaintiff "began decreasing or discontinuing her substance abuse, her psychiatric symptoms began to subside.").

We do not ignore the Plaintiff's argument, that his alcohol abuse is not material because Dr. Sohler's report states that the Plaintiff's alcoholism was secondary to his PTSD. However, we find that the ALJ properly explained her valid reasons for discounting that report, which was completed several years after the date last insured, which does not purport to relate back to the date last insured -- in fact, Dr. Butler noted that the Plaintiff's mental health appeared to deteriorate along with his physical symptoms, after the date last insured -- and which conflicted with Dr. Butler's assessment of the relevant time period, an assessment that is consistent with the objective medical evidence and the Plaintiff's own reports.

As well, the ALJ addressed that, even without the alcohol use, the effects of which must be excluded from the final RFC, the medical evidence of Record did not demonstrate limitations further than the RFC assessed for the relevant time period. Accordingly, we do not find error in the ALJ's reasoned treatment of Dr. Sohler's

report, nor do we find that the report significantly detracts from the substantial evidence which supports the ALJ's determination, that the Plaintiff's alcohol abuse was a material contributing factor to his disability.

        3.      <u>Whether the ALJ erred in formulating the RFC</u>.

        Since the ALJ must consider, and account for, the Plaintiff's subjective complaints when formulating an appropriate RFC, and since the limitations of the RFC comprise the hypothetical promulgated to the VE, we address the Plaintiff's credibility challenges in conjunction with our review of the RFC the ALJ formulated.

        a)     <u>Standard of Review</u>.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  See, <u>Dukes v. Barnhart</u>, 436 F.3d 923, 928 (8th Cir. 2006)("Where adequately explained and supported, credibility findings are for the ALJ to make."), quoting <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000), citing, in turn, <u>Tang v. Apfel</u>, 205 F.3d 1084, 1087 (8th Cir. 2000); see also, <u>Driggins v. Bowen</u>, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); <u>Underwood v. Bowen</u>, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, <u>Leckenby v. Astrue</u>, 487 F.3d 626, 632 (8th Cir. 2007)("We do not reweigh the

evidence presented to the ALJ, and we defer to the ALJ's determinations regarding the credibility of testimony, as long as these determinations are supported by good reasons and substantial evidence."), citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006); see also, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, Eichelberger v. Barnhart, supra at 590 ("The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints."); Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990). These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ. See, Johnson v. Secretary of Health and Human Services, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth

Circuit by <u>Polaski v. Heckler</u>, supra, and its progeny.  See, e.g., <u>Flaherty v. Halter</u>, 182 F. Supp. 2d 824, 829 (D. Minn. 2001);  <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996); <u>Shelton v. Chater</u>, supra at 995; <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996).  Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.      the claimant's daily activities;

2.      the duration, frequency, and intensity of the pain;

3.      precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of medication; and

5.      functional restrictions.

<u>Polaski v. Heckler</u>, supra at 1322; see also, <u>Gonzales v. Barnhart</u>, supra at 895 (listing factors for credibility analysis); <u>Choate v. Barnhart</u>, supra at 871 (same).

The ALJ must not only consider those factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole.  See, <u>Jones v. Chater</u>, supra at 826; <u>Delrosa v. Sullivan</u>, 922 F.2d 480, 485 (8th Cir. 1991); <u>Carlock v. Sullivan</u>, 902 F.2d 1341, 1343 (8th Cir. 1990).  "However, the ALJ need not explicitly discuss each Polaski factor."  <u>Eichelberger v. Barnhart</u>, supra at

590, citing <u>Strongson v. Barnhart</u>, supra at 1072. "The ALJ only need acknowledge and consider these factors before discounting a claimant's subjective complaints." <u>Id.</u>

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. See, <u>Ostronski v. Chater</u>, supra at 418; <u>Jones v. Chater</u>, supra at 826; but cf., <u>Johnston v. Shalala</u>, 42 F.3d 448, 451 (8th Cir. 1994) (ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [claimant's] subjective pain complaints are not credible in light of objective medical evidence to the contrary.'" <u>Gonzales v. Barnhart</u>, supra at 895, quoting <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 581 (8th Cir. 2002)[internal citation omitted].

It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. See, <u>Simonson v. Schweiker</u>, 699 F.2d 426, 429 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same

condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983), quoting, Landess v. Weinberger, 490 F.2d 1187, 1190 (8th Cir. 1973). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. See, Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997).

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied. For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling. See, Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995); Barrett v. Shalala, 38 F3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988). By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997) (ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater,

75 F.3d 414, 417 (8th Cir. 1996); <u>Shannon v. Chater</u>, supra at 487. Further, "[t]he lack of prescription medication is inconsistent with allegations of disabling impairments." <u>Rankin v. Apfel</u>, 195 F.3d 427, 430 (8th Cir. 1999); see also, <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996).

b)      <u>Legal Analysis</u>. Having closely reviewed the Record as a whole, we find that the ALJ properly considered the <u>Polaski</u> factors, and that substantial evidence supports the ALJ's determination that the Plaintiff's subjective complaints were not fully credible, as to his symptoms on, and prior to, December 31, 1999.

At the outset, we find that the Plaintiff's contemporaneous reports of his daily activities contradicted his allegations of complete disability. For example, in his Activities of Daily Living Questionnaire of October 1, 2000, the Plaintiff reported that he shopped, fished, cooked, drove, performed yard work, talked with his neighbors, attended church, read, talked on the phone, and lifted weights, on a daily or weekly basis. [T. 253]. The Plaintiff did not advise that he required any assistance with those activities, but reported that he did have to engage in them more slowly. [T. 251, 253]. Those activities discredit his subjective complaint that his physical and mental impairments were disabling. See, <u>Wagner v. Astrue</u>, 499 F.3d 842, 851-53 (8th Cir.

2007)[collecting cases]; <u>Spradling v. Chater</u>, 126 F.3d 1072, 1075 (8th Cir. 1997); <u>Chamberlain v. Shalala</u>, supra at 1494 (shopping, cooking, fishing, driving); <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1025 (8th Cir. 2007)(driving, housework, grocery shopping, handling money); <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 (8th Cir. 2000)(exercise, inter alia); <u>Flaherty v. Halter</u>, supra at 829 (exercise, bathing, shopping, laundry); <u>Banks v. Massanari</u>, 258 F.3d 820, 826 (8th Cir. 2001)(regular attendance at church discredited complaints regarding the severity of depression); <u>Jones v. Callahan</u>, 122 F.3d 1148, 1153 (8th Cir. 1997)(daily activities not limited from emotional causes); cf., <u>Reed v. Barnhart</u>, 399 F.3d 917, 923 (8th Cir. 2005)(the ability to perform light daily activities does not equivocate the ability to perform full time work). Further, the ALJ accounted for the Plaintiff's self-reported reduced ability to climb, stand, lift, and walk, in her RFC, [T. 254], and noted that further physical restrictions were inconsistent with the medical evidence of Record.

As the ALJ addressed, the Plaintiff's contemporaneous reports to medical professionals, and his failure to seek more than minimal treatment during the relevant time period, also discount his credibility as to the severity of his mental and physical symptoms. The Plaintiff completed a mental health screening form on September 24, 1998, and had a follow-up screening appointment on September 28, 1998, just after

his alleged onset date.  At that time, the Plaintiff first reported, and then denied, his PTSD diagnosis, he related that he experienced some bad dreams, but that he was "o.k." with them, and stated that he had no other mental health problems, but had previously been treated with Prozac, which had improved his symptoms.  [T. 1831].  Approximately one year earlier, on June 25, 1997, the Plaintiff was seen by Dr. Prakash for a psychiatric evaluation, in which he denied nightmares or flashbacks, and reported that he had never sought treatment for depression,[56] but had completed four (4) alcohol treatment programs.  [T. 1249].

We recognize that a claimant's failure to comply with his mental health treatment may be a symptom of that mental illness, and may not always discredit subjective complaints of symptoms.  See, Pates-Fire v. Astrue, 564 F.3d 935, 943 (8th Cir. 2009).  However, here, the Plaintiff did not simply refuse to take medications that were prescribed to him, he denied mental health symptoms in a number of evaluations, which detracts from the claimed severity of his symptoms, that assertedly resulted from those impairments, during the relevant time period.  See, Muckler v. Astrue, 656 F. Supp.2d 1032, 1066 (D.S.D., August 14, 2009)(subjective complaints were

---

[56]The medical records demonstrate that the Plaintiff did participate in counseling, with a Social Worker, for several months from 1989 to 1990, as part of his follow-up after an alcohol treatment program.

contradicted by statements made in contemporaneous medical records); <u>Stephens v.</u>

<u>Shalala,</u> 46 F.3d 37, 38 (8th Cir. 1995)(complaints discredited by absence of complaint

in medical records during relevant time period); <u>Gwatheney v. Chater</u>, 104 F.3d 1043,

1045 (8th Cir. 1997)(failure to seek treatment); <u>Jones v. Callahan</u>, supra at 1153

(subjective claims discredited because claimant was not undergoing regular mental-

health treatment or regularly taking psychiatric medications, and daily activities were

not restricted from emotional cause); <u>Davis v. Barnhart</u>, 197 Fed. Appx. 521, 523 (8th

Cir. 2006), citing <u>Banks v. Massanari</u>, 258 F.3d 825-26 (8th Cir. 2001); <u>Martin v.</u>

<u>Astrue</u>, 2009 WL 2982938 at *20 (D. Minn., September 14, 2009); <u>Peterson v.</u>

<u>Astrue</u>, 2008 WL 4323717 at *21 (D. Minn., September 18, 2008) (opinion of treating

physician, that the plaintiff's PTSD had been disabling for the past thirty (30) years,

was contradicted by the Record, which reflected little treatment for the condition, and

which demonstrated that the plaintiff reported a wide variety of activities).

As to his physical complaints, the Plaintiff's conservative treatment for his right

knee and back, as well as his failure to seek treatment, in conjunction with the opinion

of Dr. Frazin, which was based upon his review of the clinical observations that are

contained in the medical records, supports the ALJ's conclusion that his subjective

complaints, regarding the intensity of his physical impairments during the relevant

time period, were not fully credible.  See, <u>Smith v. Barnhart</u>, 83 Fed.Appx. 154, 154 (8th Cir., December 17, 2003); <u>Johnson v. Chater</u>, 108 F.3d 942, 947 (8th Cir. 1997).  While at the Montana State Prison, from 1998 to 2000, the Plaintiff only sought care for his knee three (3) times, and was treated conservatively with medication, which discredits his claims of disabling pain and swelling.  See, <u>Moore v. Astrue</u>, 572 F.3d 520, 524-25 (8th Cir. 2009)(pain which was managed by conservative treatments with medications was inconsistent with claims of disabling pain); <u>Luckenbach v. Barnhart</u>, 36 Fed.Appx. 872, 873 (8th Cir., June 13, 2002) (record demonstrated the claimant had sought little medical prior to the date last insured).[57]

Moreover, as the ALJ properly observed, the objective medical evidence was inconsistent with the severity of the Plaintiff's complaints.  Upon examination at his admission, in late September of 1998, after his claimed onset date, the Plaintiff was observed to have a full range of motion in his right knee and his back, and in his examination of June 25, 1997, Dr. Hoenig observed only a ten (10) degrees of reduction in the right knee range of motion.  Accordingly, we find no error in this

---

[57]We have considered the Plaintiff's argument, that knee replacement surgery was being considered as early as 1990 but, by the Plaintiff's own assertion, he has only been "a candidate for total knee replacement since 2003."  See, <u>Plaintiff's Memo</u>, at p. 58 n.10; [T. 1730].

aspect of the ALJ's credibility determination, which she fully discussed, and which is supported by substantial evidence in the Record as a whole. See, <u>Farstad v. Astrue</u>, 342 Fed.Appx. 221, 222 (8th Cir., August 11, 2009), citing <u>Finch v. Astrue</u>, 547 F.3d 933, 935-36 (8th Cir. 2008); <u>Garrison v. Massanari</u>, 2001 WL 1631323 at *2 (D. Minn., July 30, 2001)(no error where ALJ "cited numerous factors" which detracted from the subjective complaints, including lack of medical evidence, normal clinical findings, a failure to seek regular medical care, use of only over-the-counter medications, and a "demanding daily schedule").

We also find that the ALJ's determination of the believability of the Plaintiff's mother was supported by substantial evidence. The ALJ found that her testimony, that the Plaintiff required a cane, was inconsistent with the medical evidence, which failed to demonstrate that the Plaintiff had been prescribed a cane during the relevant period, and that, ultimately, the ALJ reduced the Plaintiff's RFC in order to account for the Plaintiff's reported irritability, while the remainder of the mother's testimony did not require a further reduction in the RFC. Of course, the ALJ is free to disbelieve the testimony of third-party witnesses, see, <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996), and we find no error here, where substantial evidence supports the credibility finding -- indeed, the witness doubted her own her memory. We further find no

internal inconsistency, between the ALJ's determination that the Plaintiff's mother was sincere -- i.e. not purposefully inaccurate -- but was not credible, given the existence of plain inconsistencies.

In sum, "[w]here adequately explained and supported," as we find to be the case here, "credibility findings are for the ALJ to make." <u>Dukes v. Barnhart</u>, 436 F.3d 923, 928 (8th Cir. 2006), quoting <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000). As a consequence, "[b]ecause the ALJ was in a better position to evaluate credibility, we defer to his credibility determinations as long as they were supported by good reasons and substantial evidence." <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006), citing <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005). Accordingly, we find that the ALJ made no reversible error in assessing the credibility of the Plaintiff and his mother.

Beyond criticizing the ALJ's credibility findings, the Plaintiff also argues that the ALJ erred in formulating his RFC, because she determined that the Plaintiff could be on his feet for six (6) hours, off and on, in an eight (8) hour day, whereas Sullivan, who was the Certified Physician Assistant at the Montana State Prison, restricted the Plaintiff from "prolonged standing" and "distance walking." We find that the ALJ committed no error in formulating the Plaintiff's RFC in this, or in any other respect.

The RFC decision is a finding of fact, which must be supported by substantial evidence on the Record as a whole.  See, <u>Page v. Astrue</u>, 484 F.3d 1040, 1043 (8th Cir. 2007)(the ALJ must determine the RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the claimant's] own description[.]"), quoting, <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995). We acknowledge that, "[a]lthough the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, we have also stated that a claimant's residual functional capacity is a medical question." <u>Lauer v. Apfel</u>, 245 F.3d 700, 703-04 (8th Cir. 2001)[internal quotations omitted], citing <u>Roberts v. Apfel</u>, 222 F.3d 466, 469 (8th Cir. 2000), and <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000).  Accordingly, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  <u>Id.</u> [internal quotations omitted], citing <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th Cir. 2000), and <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000).

The opinion of a consulting physician, who has not personally examined the claimant, is not, standing alone, substantial evidence.  See, <u>Nevland v. Apfel</u>, supra at 858; see also, <u>Singh v. Apfel</u>, supra at 452.  However, "[i]t is well settled that an

ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004), citing, Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000); Hacker v. Barnhart, 459 F.3d 934, 939 (8th Cir. 2006). Moreover, the opinion of a non-examining, non-treating medical source, such as a physician or a psychologist who reviews the medical records, may "help provide substantial evidence where other evidence in the record supports the opinion of that physician." Loiselle v. Astrue, 2008 WL 3369457 at *10 (D. Minn., August 8, 2008), citing, Coleman v. Astrue, 498 F.3d 767, 772 (8th Cir. 2007). The weight afforded non-examining medical sources depends upon "the degree to which they provide supporting explanations for the opinions." 20 C.F.R. §404.1527(d)(3).

Social Security Ruling 06-03P, 2006 WL 2329939 at *2, explains the distinction between "acceptable medical sources," and other health-care providers. One distinction is that "[o]nly 'acceptable medical sources' can be considered treating sources * * * whose medical opinions may be entitled to controlling weight." However, opinions from non-acceptable medical sources, such as Physician Assistants like Sullivan, "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence on

file." Id. at *3; <u>Dover v. Astrue</u>, 2008 WL 5083512 at *5 (E.D. Ky., November 26, 2008).

Accordingly, the ALJ was not required to afford controlling weight to the limitations espoused by Sullivan, and she properly provided a reasoned explanation for the weight that she accorded to his opinions, and incorporated his limitations on climbing in the RFC, as well as reduced the amount of time that the Plaintiff would be on his feet, by limiting bending, stooping, crouching, and crawling. [T. 36-37].

The Plaintiff has also objected to what he views to be an inconsistency in the ALJ's opinion; namely, that the Sullivan restricted the Plaintiff to no repetitive climbing, no distance walking, and no prolonged standing, which was consistent with other evidence of Record but, nonetheless, the Plaintiff's RFC included a six (6) hours of walking/standing restriction. [T. 37]. In context, the portion of the ALJ's opinion, where she states that she gave "great weight" to Sullivan's opinions, was devoted to explaining the treatment and consideration she had given to the medical evidence generally. After noting the great weight afforded to the opinions of Sullivan, the ALJ continues, in that same paragraph, by stating that "[i]t is significant to note that no treating and/or examining acceptable medical source imposed any work related functional limitations beyond those set forth by the undersigned during the relevant

period in this adjudication." [T. 37]. Further, on the page before, the ALJ noted that she also afforded Dr. Frazin's opinion great weight and, on the page before that, she advised that "the objective medical evidence, minimal treatment during the relevant period in this adjudication, and dosage, effectiveness, and side effects of medication do not support claimant's assertions of disabling functional limitations and are fully consistent with the residual functional capacity set forth in addition to the credible and persuasive interrgatory [sic] responses completed by Dr. Jared Frazin." [T. 35].

We recognize that Social Security Ruling 83-12 provides that an individual who must alternate periods of sitting and standing, except those who may be accommodated by a normal break schedule, is "not functionally capable of doing * * * the prolonged standing or walking contemplated for most light work." However, Sullivan's report does not include his understanding of "prolonged standing," and we do not find the ALJ's interpretation, that regular breaks, and restrictions from stooping and other on-the-feet work, would be sufficient to accommodate the Plaintiff's needs, to be a finding that was unsupported in view of the Record on the whole. Viewing the opinion as a whole, we find no inconsistency which would constitute reversible error, as there is not the slightest indication in anything contained in the ALJ's decision, that would so much as intimate that the Plaintiff was capable of standing, without break,

for the entire six (6) hour period, and we have no reason to find to the contrary. See, Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)(if there is an inconsistency, the Court must determine whether a remand might lead to a different ultimate result); Owen v. Astrue, 551 F.3d 792, 801 (8th Cir. 2008)("[A]n arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome."), quoting Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008).

The ALJ also provided a thorough, and reasoned explanation for the weight afforded to the opinion of Dr. Frazin, who was a non-examining Medical Expert, who reviewed the entire Record, and whose RFC was consistent with the medical evidence of Record. [T. 35]. While the Plaintiff disputes Dr. Frazin's understanding of the Record, that disagreement centers around Dr. Frazin's asserted failure, in his testimony, to recall Dr. Robins' diagnosis of degenerative arthritis in his right knee in 1986. [T. 2054]. However, Dr. Frazin testified that he placed more weight upon the functional observations recorded during the Plaintiff's medical visits, than upon a diagnosis from many years before the relevant time period. [T.2054]. As the ALJ noted, Dr. Frazin's Interrogatories demonstrate that he examined the entire Record, and did not solely rely upon Dr. Burton's 1993 consultive examination, as did Dr.

Frazin's testimony, wherein he cited to examinations performed by Dr. Hoenig, in 1997, and Dr. Curry, on October 10, 2001, as well as Dr. Burton's conclusions from 1993.  [T. 2045 and 2048].

Moreover, Dr. Frazin's opinion is not inconsistent with the recommendations made by Dr. Robins.  While Dr. Robins opined, on April 6, 1987, that the Plaintiff should be restricted to a "sedentary type of work," a term that he did not explain in detail,[58] [T. 1292], a year later, on May 23, 1988, after what appears to have been a vocational examination that was completed by another medical professional, and that is not included in the Record, Dr. Robins concluded that  the Plaintiff could return to work, with restrictions on prolonged kneeling, frequent climbing, frequent squatting, and carrying of heavy loads.  [T. 365, 1295].  As the ALJ discussed, the medical records, which documented the functionality of the Plaintiff's right knee and back, are consistent with Dr. Frazin's opinions, and we find that the RFC is properly based on

---

[58]In fact, Dr. Robins noted, just one (1) month earlier, that the description of the Plaintiff's current position was related to him as "work involving kneeling, squatting, stair climbing, carrying of heavy loads, etc."  [T. 1290].

"some medical evidence," which is supported by substantial evidence on the Record as a whole.[59]  See, <u>Eichelberger v. Barnhart</u>, supra at 591.

Additionally, the ALJ did not adopt Dr. Frazin's opinion wholesale, and reduced her RFC -- by restricting the use of foot pedals on the right, crouching, and crawling, and minimizing bending, stopping, twisting, and climbing -- in order to account for the Plaintiff's subjective complaints, to the extent they were credible, and to incorporate Sullivan's restrictions, to the extent they were consistent with the medical evidence of Record, during the relevant time period.

It is critical to recall that the Plaintiff was required to demonstrate that his impairments were disabling on or before December 31, 1999.  See, <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006)(the claimant must show disability on or before date last insured), citing <u>Pyland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998).  As the ALJ observed, the Record evidences that the Plaintiff's condition, particularly in relation to his right leg, deteriorated from 2002 forward, with a number of fractures.  While that evidence is not irrelevant, the ALJ properly determined that it reflects new medical conditions, or a worsening of the Plaintiff's symptoms, and the ALJ

---

[59]The ALJ further expressed her reasons for discrediting Dr. Robins' opinion, that the Plaintiff should be limited to "sedentary" work, because of its remoteness in time from the relevant time period, and its inconsistency with the Record as a whole.

committed no error in placing greater weight on the medical evidence that was more contemporaneous to the relatively short period of time between the Plaintiff's onset date of September 1, 1998, and his date last insured of December 31, 1999. See, e.g., Sykes v. Bowen, 854 F.2d 284, 286 (8th Cir. 1988); Piper v. Astrue, 2008 WL 3368907 at *15 (D. Minn., August 8, 2008)(ALJ did not err by failing to obtain medical records that were generated after the date last insured).

Accordingly, we find and conclude that the ALJ's RFC was based on substantial evidence, and we further find substantial evidence to support the mental RFC formulated by the ALJ which accounts for the Plaintiff's mental impairments without the use of alcohol. Based upon Dr. Butler's opinion, that the Plaintiff demonstrated difficulty with authority figures, which was supported by the Record, and based upon the testimony of the Plaintiff's mother, that he was irritable, and did not always get along with others, which was also supported by the Record, the ALJ formulated the RFC to include only brief and superficial contact with others. The fact that he is able to interact with others, to some degree, is demonstrated by the observations of the Social Security Administration claims representative, who observed that he was polite, well-groomed, and pleasant, in 2000, by Dr. Prakash's observation, that the Plaintiff was cooperative and pleasant in 1997, and by the report

of Drs. Bowman and Hill, that the Plaintiff was cooperative and social during his six (6) week hospital stay in 1994, even though he had a few temper outbursts.

The ALJ also restricted the Plaintiff to low to moderate standards of pace and persistence, and simple, unskilled tasks, in order to account for Dr. Butler's opinion, that the Plaintiff would have moderate difficulty with short, simple instructions, but marked difficulty with complex instructions, even without alcohol use. For those reasons, and for the reasons we have detailed with respect to the Plaintiff's alcohol abuse, we find that the ALJ appropriately considered the evidence of Record as a whole, and her physical and mental RFC is supported by substantial evidence of Record.

4. <u>Whether the ALJ correctly formulated the hypothetical for the VE</u>.

a) <u>Standard of Review</u>. It is well-established that a hypothetical question must precisely set out all of the claimant's impairments that the ALJ accepts as supported by the Record. See, <u>Hallam v. Barnhart</u>, 211 Fed.Appx. 519, 521 (8th Cir., November 27, 2006)(ALJ must include in hypothetical those limitations that he finds consistent, credible, and supported by Record as a whole); <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 889 (8th Cir. 2006). "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by

substantial evidence in the record and accepted as true." Goff v. Barnhart, supra at 794, quoting Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001), citing, in turn, Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000); see also, Grissom v. Barnhart, supra at 837.

"A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant." Harwood v. Apfel, 186 F.3d 1039, 1044 (8th Cir. 1999), citing Hutton v. Apfel, supra at 656. The hypothetical does not need to include medical terminology from the Record, but should capture the "concrete consequences" of the supported impairments. Lacroix v. Barnhart, supra at 889, citing Roe v. Chater, supra at 676-77; see also, Gill v. Barnhart, 2004 WL 1562872 *7 (D. Neb., July 13, 2004); Hunt v. Massanari, supra at 625.

        b.   Legal Analysis. The Plaintiff argues that the ALJ posed a flawed hypothetical to the VE, which failed to capture the concrete consequences of his alleged disabilities. See, Plaintiff's Memorandum, supra at 55-56. The argument is based solely upon the Plaintiff's contention that the ALJ formulated an improper RFC, by failing to incorporate all of the limitations that were imposed by Sullivan.

As we have already detailed, the ALJ is only required to include, in her hypothetical, those impairments that she finds to be supported by the Record. See, Lacroix v. Barnhart, supra at 889. For reasons we have previously expressed, the ALJ properly discussed the weight she afforded to the medical opinions of Record, and supported her formulation of the Plaintiff's RFC with reasons, and references to the Record, and therefore, the Plaintiff's argument to the contrary is without merit.

Moreover, based upon her consideration of the Plaintiff's limitations, the ALJ crafted her hypothetical to reflect the Plaintiff's limitations, and assumed, based upon the Record, that the hypothetical individual would only perform simple unskilled tasks, with brief and superficial contact others, low to moderate standards of pace and persistence, at the light exertional level, with being on his feet for a total of 6 hours out of an 8 hour workday, but with minimal twisting, bending, stooping, and climbing, and in an alcohol-free environment. [T. 2093]. The ALJ also restricted over the shoulder work on the right, the use of foot pedals on the right, and crouching and crawling, as well as heights, ladders, and scaffolds, and exposure to extremes of temperature and humidity. [T. 2093].

Upon that hypothetical, the VE responded that the Plaintiff could not perform any of his previous relevant work, but that jobs were available, in the regional

economy, that satisfied those assumed restrictions. [T. 2093]. Given that the ALJ included all of the relevant limitations, in her formulation of the Plaintiff's RFC, the VE's Responses to Interrogatories constituted substantial evidence to support the ALJ's decision concerning the Plaintiff's ability to work. See, Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008)(recognizing that VE's testimony is substantial evidence when it is based on accurately phrased hypothetical that captures the concrete consequences of the claimant's limitations). Accordingly, we conclude that the assumptions, which were employed by the ALJ in proposing a hypothetical to the VE, properly included those restrictions on the Plaintiff's functional capacities that were consistent with the Record as a whole, and we find no reversible error in that respect.

As a consequence, after a thorough review of the Record, as well as the arguments of the parties, we find that the ALJ made no legal error, and that the factual findings are supported by substantial evidence on the Record as a whole. We would be derelict if we did not add that, given the expansiveness of the Record presented, the ALJ should be credited for her attention to detail, and for her dedication to a full and exhaustive assessment of the medical records, the testimony of the witnesses, and the opinions of all who have examined the Plaintiff, or who formed clinical judgments based upon an assessment of the entire Record. On occasion, an ALJ may become

overwhelmed by the voluminous nature of the tasks presented, but we commend this ALJ for exercising the patience, and the principled approach, of doing the necessary to responsibly decide the issues presented. In sum, we recommend that the Plaintiff's Motion for Summary Judgment be denied, and the Defendant's Motion for Summary Judgment be granted.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Plaintiff's Motion [Docket No. 19] for Summary Judgment be denied.

2.    That the Defendant's Motion [Docket No. 26] for Summary Judgment be granted.


Dated: February 12, 2010              *s/Raymond L. Erickson*
                                      Raymond L. Erickson
                                      CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than

**February 26, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **February 26, 2010**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.